HYATT CORPORATION, d/b/a Hyatt Regency O'Hare, Plaintiff-Appellant, v. ROGER D. SWEET, Director of the Illinois Department of Revenue, *et al.*, Defendants-Appellees.

First District (6th Division)   No. 1—91—0957

Opinion filed May 22, 1992.

George M. Hoffman and Diane M. Anderson, both of Neal, Gerber & Eisenberg, of Chicago, for appellant.

Roland W. Burris, Attorney General, of Springfield (Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for appellees.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

This is an appeal involving the construction of a section of the Retailers' Occupation Tax Act (the Act) (Ill. Rev. Stat. 1989, ch. 120, par. 441). The trial judge interpreted the Act in the manner argued by the defendant Director of the Illinois Department of Revenue (the Department), and entered summary judgment against the plaintiff, Hyatt Corporation. The Hotel-Motel Association of Illinois has filed an *amicus curiae* brief in this court in support of the plaintiff's appeal.

The plaintiff operates the hotel known as the Hyatt Regency O'Hare (the Hotel), located at 9300 West Bryn Mawr in Rosemont, Illinois. The Hotel offers banquet facilities and employs waiters, wait-

resses, bartenders and busboys (collectively referred to as the Servers) to serve customers at its banquet functions.

The Hotel's banquet customers pay a mandatory service charge equal to a percentage of the price of the food and beverages they consume. On the customers' bills, the service charge is stated separately from the charges for food and beverages.

The Servers are compensated in accordance with the provisions of the Hotel's collective bargaining agreements with the union representing the Servers. In addition to uniforms, vacation pay, and other benefits, the Servers receive direct cash compensation labeled "shift pay" and "commissions." "Shift pay" is the specified dollar amount or wage that a Server earns for working at a banquet function. "Commissions" are 88.1% of the service charge billed by the Hotel for that function. "Shift pay" is 11.9% of the service charge. The Servers are not salaried employees; they are paid only for hours worked and receive a single weekly paycheck including shift pay and commissions earned that week. The Hotel is not obligated to hire the Servers for any minimum hours per week or other period, nor is it required to pay the Servers any fixed or minimum compensation. Under the terms of the collective bargaining agreements, the service charge for the period of July 1, 1986, through October 31, 1988, was to be 16%, and the service charge for the period of November 1, 1988, through August 31, 1989, was to be 17%. If the Hotel did not charge a service charge at least equal to the percentage stated in the collective bargaining agreements, then the Servers were free to solicit tips, and they were entitled to keep 100% of the tips they solicited.

For the period of July 1, 1986, through August 31, 1989 (the Audit Period), the Hotel collected and remitted the proper amount of State and local Retailers' Occupation Tax (ROT) on its charges for the food and beverages it served at banquets. The Hotel did not collect or remit State or local ROT on the service charges, believing those charges to be exempt under the following provision of the Retailers' Occupation Tax Act (Ill. Rev. Stat. 1989, ch. 120, par. 441):

"§2. Except as hereinafter provided, a tax is imposed upon persons engaged in the business of selling tangible personal property *** at retail at the rate of 6.25% of the gross receipts from such sales of tangible personal property made in the course of such business, excluding, however, from those gross receipts *** (e) the proceeds of any mandatory service charge which is separately stated on customers' bills for purchase and consumption of food and beverages, if all of the proceeds of the service charge are in fact turned over to the employees who

would normally have received tips had the service charge policy not been introduced ***."

The Department proposed the following deficiencies of ROT and interest in connection with the service charges for the Audit Period:

|  | Tax | Interest | Total |
|---|---|---|---|
| State ROT | $179,442.71 | $40,297.14 | $219,739.85 |
| Municipal ROT | 35,888.14 | 8,059.43 | 43,947.57 |
| RTA ROT | 35,888.15 | 8,059.43 | 43,947.58 |
| Totals | $251,219.00 | $56,416.00 | $307,635.00 |

The plaintiff paid $307,635.00 pursuant to section 2a of the State Officers and Employees Money Disposition Act (Ill. Rev. Stat. 1989, ch. 127, par. 170 *et seq.*) and filed this action in the circuit court to review the proposed deficiencies. Count I of the complaint claimed that the service charge was exempt under the regulations promulgated under the Act. (86 Ill. Adm. Code §130.450 (1985).) Count II, pleaded as an alternative to count I, claimed that the service charge was exempt under section 2(e) of the Act. Count III alleged that an additional $15,094 plus interest paid by the Hotel under protest represented taxes on banquet sales for high school proms, which were exempt sales to exclusively charitable, religious or educational organizations under section 2 of the Act. The funds sought in count III were refunded to the Hotel by agreed order dated September 18, 1990.

Each count of the complaint sought an order (1) restraining the Department from transferring the funds that the plaintiff had paid under protest from the special protest fund to the general revenue fund; (2) directing the Department to repay to the plaintiff the funds paid under protest, plus interest; and (3) restraining the Department from seeking to impose ROT on any portion of the service charge.

On October 26, 1989, the trial judge granted the plaintiff's emergency motion for a temporary restraining order enjoining the Department from transferring from the protest fund the sum paid by the plaintiff until a final judgment was rendered. The injunction was continued by agreement and is presently in force.

The plaintiff filed a motion for summary judgment on count II of its complaint, and the Department filed a cross-motion for summary judgment. Both sides maintained that section 2(e) of the Act was unambiguous; the plaintiff argued that its service charges were clearly exempt under the statute, and the Department argued that the charges just as clearly were not exempt. On December 10, 1990, the judge denied the plaintiff's motion and granted the Department's mo-

tion. The judge then granted the plaintiff's motion to voluntarily dismiss count I.

■■ This appeal centers on the interpretation of section 2(e) of the Act, which provided when this dispute arose[1] an exemption for

"the proceeds of any mandatory service charge which is separately stated on customers' bills for purchase and consumption of food and beverages, if all of the proceeds of the service charge are in fact turned over to the employees who would normally have received tips had the service charge policy not been introduced." (Ill. Rev. Stat. 1989, ch. 120, par. 441.)

Accordingly, a service charge must meet three requirements in order to qualify for the exemption. First, it must be mandatory. Second, it must be separately stated on the customers' bills. Third, all of the proceeds of the service charge must be in fact turned over to the employees who would normally have received tips absent the mandatory service charge.

Neither party disputes that the plaintiff's service charge met the first two requirements: it was mandatory and it was separately stated on the bill. The plaintiff admits that only 88.1% of the proceeds of the service charge was turned over to the Servers in the form of tips, or "commissions." However, the plaintiff argues that the trial judge erred in finding that it did not meet the requirements of the statute by turning over the remaining 11.9% to the Servers in the form of wages, or "shift pay."

The plaintiff contends that it met the requirements of the statute by paying the Servers cash compensation, designated as "commissions" and "shift pay," totalling nearly $1 million more than the total amount of the service charges. It maintains that its distinction between "shift pay" and "commissions" is simply an internal accounting procedure which should not be considered in determining whether the exemption requirements have been met.

The Department's argument has been abbreviatedly identified as an "all-or-nothing" position: If the plaintiff paid over anything less than the full amount of the service charge, it would be required to pay tax on the entire amount, not just on the amount paid as "shift pay." The Department bases its argument on the language of section 2(e) which conditions the exemption on the employer's turning over to

---

[1]The relevant section of the Act was amended after the judge issued a ruling in this case. (Pub. Act 87–207, eff. Sept. 3, 1991.) The effect of the amendment will be discussed later in this opinion.

its employees "*all* of the proceeds" of the service charge. (Emphasis added.)

The trial judge accepted the defendant's argument; she found that the statute was unambiguous and ruled as follows:

> "Although this Court finds Section 2(e) to be free from apparent ambiguity, plaintiff relies on the legislative history to demonstrate that their [*sic*] interpretation and application of Section 2(e) is within the meaning and intent of the legislature. Unfortunately, the legislative history supports the defendant's position instead of the plaintiff's position. Clearly, the legislators intended the mandatory service charge to be the servers' tips, and the employer to be the collecting agent of the servers. *None* of the monies collected were to be used to cover the employer's expenses and obligations but were to be treated and disbursed as 'commissions', paid *completely* and directly to the servers. [(Emphasis added.)] Here, the servers received *no* benefit; their tips were used to pay them what was already theirs by way of the employer's contract obligations." (Emphasis in original.)

Both parties have argued, and the judge agreed, that the statute is unambiguous. The plaintiff maintains that even though the statute is unambiguous, legislative history may still be considered by the court in determining legislative intent, citing *People ex rel. Nelson v. Olympic Hotel Building Corp.* (1950), 405 Ill. 440, 445, 91 N.E.2d 597, 600 ("Resort to explanatory legislative history has been declared not to be forbidden no matter how clear the words may first appear on superficial examination"). The Department maintains that the Act is not ambiguous and that, therefore, legislative history may not be considered; but, if this court determines that the statute is ambiguous and that legislative history may be considered, the legislative history will disclose that the legislature intended that the Act be construed in the manner urged by the Department. Our threshold task is to determine whether the statute is ambiguous; we are not bound by the agreement of the parties that the statute is not ambiguous.

■ Ambiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses. (2A N. Singer, Sutherland on Statutory Construction §45.02, at 6 (Sands 5th ed. 1992).) The Department's interpretation of the statute in this case hinges on the language "employees who would normally have received tips had the service charge policy not been introduced." The Department argues that this language clearly expresses the legislature's intent that the service charge is to be a sub-

stitute for tips; therefore, all of the proceeds of the charge are to be paid in addition to "shift pay." The plaintiff focuses on the language "if all of the proceeds of the service charge are, in fact, turned over." The plaintiff asserts that it turned over an amount in excess of the proceeds of the service charge, thus satisfying the "all of the proceeds" requirement, and that this money was paid to the Servers, who are "employees who would normally have received tips had the service charge policy not been introduced." Both of these interpretations are reasonable, and, in our judgment, they reveal an ambiguity in the statute. We cannot determine from the express language of the statute whether the legislature intended that the service charge be turned over to the Servers *in addition to* wages as a substitute for tips, or whether it merely intended that the service charge be turned over *in lieu of* wages or other benefits. Moreover, the language of the statute itself does not make it clear that the legislature intended to tax all of the service charge if less than all of it was turned over to the employees, or whether only the portion not turned over to the employees was intended to be taxable.

■ Our next step is to determine to what extent we may consider the legislative history and particularly the remarks of the legislators during debates. It is the general rule that legislative debates may be considered to determine the history of the times or of the evil which the legislation was intended to remedy. (*Finish Line Express, Inc. v. City of Chicago* (1978), 72 Ill. 2d 131, 379 N.E.2d 290.) *Finish Line* was cited in *Morel v. Coronet Insurance Co.* (1987), 117 Ill. 2d 18, 509 N.E.2d 996, in which the supreme court said more broadly that "[t]his court has previously looked to the debates on the floor of the General Assembly to ascertain the legislative intent underlying specific legislation." (117 Ill. 2d at 24.) The court, however, restricted the use of legislative debates as a construction aid to those statements made within the context of legislative debates and refused to consider statements of legislators made four years after the legislation had been passed. We conclude that we may properly consider the debates, at least, to determine the history of the legislation and the evil it was intended to remedy.

Before 1979, the Act provided that taxes were to be paid on "gross receipts" and defined gross receipts as the "total selling price or the amount of [sale of personal property]." "Selling price" or "amount of sale" meant the consideration for a sale valued in money including cash and services as "determined without any deduction on account of the cost of the property sold, the cost of materials used, *labor or service cost* or any other expense whatsoever" excluding

State or local taxes. (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 120, par. 440.) The Department argued, and the appellate court agreed, that the 15% mandatory gratuity charged by a catering company and separately stated on the customer's bill was not deductible from the selling price of food and drinks and thus was a taxable part of gross receipts. *Fontana D'Or, Inc. v. Department of Revenue* (1976), 44 Ill. App. 3d 1064, 358 N.E.2d 1283, relying on *Cohen v. Playboy Clubs International, Inc.* (1974), 19 Ill. App. 3d 215, 311 N.E.2d 336.

In 1979, Senator Mitchler introduced Senate Bill 1137, which added section 2(e); he said this:

"The bill provides for exemption of the proceeds of any mandatory service charge which is separately stated on a customer's bill for purchase and consumption of food and beverages. Now this bill is necessary *** to reverse a rule of the Department of Revenue, which provides that the State Sales Tax must be collected on a service or gratuity charge if the charge is mandatory." 81st Ill. Gen. Assem., Senate Proceedings, May 22, 1979, at 151-52 (statement of Senator Mitchler).

After that statement by Senator Mitchler, the following occurred:

"SENATOR SAVICKAS:

*** I could see the need for this bill. The only question comes to mind is how are we sure that the employees are getting this tip or the service charge and the employer is not just keeping it in his pocket. Is there some way that this can be determined that the waitresses or whatever are receiving the gratuity charge?

*  *  *

SENATOR MITCHLER:

Senator Savickas, there is nothing in the bill that relates to the collection and distribution of the gratuities to the employees, that's a[n] ... arrangement between the employees. I have discussed this bill, however, in the various restaurants and find that there's many, many ways that the gratuity that's shown on an American Express card or other types of the bill, when it's added on the bill and not given as direct cash to the waiter or waitress, is distributed. Some places immediately hand it to the waiter or waitress upon presentation of the bill at the cash registers, *** others hold it till the end of the evening. Some hold it till the end of the week, some till the end of the month. And I found all different systems. So I guess it's up to the employer and employee when they're making their contractual arrangements for employment how they work that out." 81st Ill. Gen.

Assem., Senate Proceedings, May 22, 1979, at 152-53 (Statements of Senators Savickas and Mitchler).

The Department apparently took no position on Senate Bill 1137 at the committee hearings. The bill passed the Senate and House but was vetoed by the Governor, we are informed, at the request of the Department. The Senate and House voted to override the veto.

The Department took no action against any entity which separated the service charge in the manner used by the plaintiff until 1989 when the Department completed the three-year audit of the plaintiff. The plaintiff filed this suit on October 23, 1989, and the judge entered judgment for the Department on December 10, 1990.

After the judge issued the ruling in this case, the Department promulgated the following rule:

"If any part of the service charges are used to fund or pay wages, labor costs, employee benefits or employer costs of doing business, all of the service charge is includable in gross receipts." See 86 Ill. Adm. Code §130.2145 (1991).

Pursuant to the Illinois Administrative Procedure Act (Ill. Rev. Stat. 1989, ch. 127, par. 1001 *et seq.*), the Department submitted the rule to the Joint Committee on Administrative Rules (JCAR), which was established as a "legislative support services agency" to review proposed administrative agency rules. (Ill. Rev. Stat. 1989, ch. 63, par. 1002–1.) Under the Illinois Administrative Procedure Act, each agency is required to submit proposed rules to JCAR, and JCAR then either issues an objection to the rule or notifies the agency that no objection will be issued. If an objection is issued, the agency then determines whether it wishes to withdraw the rule in response to the objection. (Ill. Rev. Stat. 1989, ch. 127, par. 1005.01.) JCAR objected to the rule proposed by the defendant and cited the comments of Senators Savickas and Mitchler and suggested that the Department's rule was contrary to section 2(e) of the Act. JCAR also noted the trial judge's action in this case and that this appeal was pending.

During oral argument, this court was informed that section 2(e) was amended, effective September 3, 1991. Section 2(e), now section 2—5(15) (Ill. Rev. Stat. 1991, ch. 120, par. 441—5(15)), reads as follows:

"Proceeds of mandatory service charges separately stated on customers' bills for purchase and consumption of food and beverages [purchased at retail from a retailer], *to the extent that* the proceeds of the service charge are in fact turned over as tips or as a substitute for tips to the employees who participate directly in preparing, serving, hosting or cleaning up the food

or beverage function with respect to which the service charge is imposed." (Emphasis added.)

Under the previous act, the "proceeds of the mandatory service charge" were exempt if "all of the proceeds of the service charge" were turned over to the Servers. Under the present act the proceeds are exempt "to the extent that the proceeds" are turned over.

We were aware that an amendment to a statute may be an appropriate source for determining the original legislative intent of the statute. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 349 N.E.2d 31.) At our request, both parties submitted memoranda on any effect the amendment may have in this case. The Department concedes that the present section 2—5(15) does not support its "all-or-nothing" argument. But, the Department contends section 2—5(15) is a change in the law and that all cases pending on September 3, 1991, are to be decided under the Act passed in 1980. The plaintiff, on the other hand, maintains that the remarks of the legislators during debate reflect the intent to clarify the law.

The Department correctly points out that a statutory amendment presumptively represents an intent to change existing law. (*State of Illinois v. Mikusch* (1990), 138 Ill. 2d 242, 562 N.E.2d 168.) That presumption, however, does not apply where the legislature enacted the amendment in response to an erroneous interpretation of the original statute. In *Gill v. Miller* (1983), 94 Ill. 2d 52, 58, 445 N.E.2d 330, the supreme court, quoting from 1A A. Sutherland, Statutory Construction §22.31, at 276 (4th ed. 1972), spoke as follows:

> " 'If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act—a formal change—rebutting the presumption of substantial change [of the original act by the amendment].' "

In *People v. Rink* (1983), 97 Ill. 2d 533, 455 N.E.2d 64, the supreme court held that an amendment to a statute enacted "shortly after" a circuit court decision holding a statute unconstitutional was a legislative interpretation or clarification of the statute rather than a change in the law. See also *People v. Badoud* (1988), 122 Ill. 2d 50, 521 N.E.2d 884.

The immediate issue before us is whether the amendment was "enacted soon after controversies arose." House Bill 1982, which amended section 2(e), was introduced in the House on April 5, 1991, less than four months after the judge's ruling; and the bill first passed the House on July 1, 1991, and the Senate on July 5, 1991. We judge that the legislature moved swiftly. We strongly disagree with the De-

partment's argument that we should consider the lapse of time from 1980, when the original act went into effect, and the time the amendment was passed. The delay in action by the legislature is understandable in light of the delay in action by the Department. We judge that the proper watershed is the judge's ruling.

We also disagree with the Department's statement that "[t]here is no reference to the circuit court ruling [in this case] in the legislative history." As previously noted, the objection of JCAR made specific reference to the circuit court's ruling in this case and this appeal. Senator Fawell was a member of JCAR. She made reference to the proceedings before JCAR when she spoke in support of the amendment. Moreover, legislative awareness of a judicial construction of the earlier version of a statute is presumed. See *People v. Badoud* (1988), 122 Ill. 2d 50, 521 N.E.2d 884.

This case brings into play two fundamental rules of statutory construction: (1) where the letter of a statute conflicts with the spirit of it, the spirit of it will be controlling (*Inskip v. Board of Trustees* (1962), 26 Ill. 2d 501, 187 N.E.2d 201); and (2) that construction of a statute will be avoided which would lead to an absurd or unjust result. (*Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 586 N.E.2d 1211.) Acceptance of the Department's "all-or-nothing" interpretation of the statute would violate both those fundamental rules. The unfairness of the Department's position is obvious. The legislature could never have intended such an unjust result, and we believe that the amendment of section 2(e), was a clarification of the original section 2(e).

■ Although we make our determination without resort to the legislative debates, since the parties have argued that those debates support their position, we deem it appropriate to address them. In our view they support our determination that the amendment was a clarification of the law.

During the debates in the Senate, Senator Fawell, who, as noted, was a member of JCAR, said the following:

> "I brought this issue up in front of JCAR. As I understand it, this legislation retroactively overrules the Department of Revenue's erroneous treatment of mandatory service charges under the existing Section of the Statute that was meant to be a broad exemption, and which applies to any compensation paid to employees for a banquet. *** It has always been the legislators' intent that all or *any part* of the mandatory service charge should be exempt from sales taxes, as long as the employer doesn't pocket—pocket the service charge. House Bill

1982 *clarifies* the legislative original intent on this Statute, and [I] certainly urge the Members to support this bill." (Emphasis added.) (87th Ill. Gen. Assem., Senate Proceedings, June 20, 1991, at 79 (statement of Senator Fawell).)

Senator Luft also noted that "[t]he amendment clarifies the intent of the underlying bill." 87th Ill. Gen. Assem., Senate Proceedings, June 18, 1991, at 58 (statement of Senator Luft).

Senator Rock, who spoke in favor of the bill, said that he had conferred with the "Restaurant Association and the hotel and motel folks." He specifically referred to the "Hyatt hotel." He concluded that "what the Department of Revenue has attempted to do simply isn't fair." (87th Ill. Gen. Assem., Senate Proceedings, June 20, 1991, at 80 (statement of Senator Rock).) Senator DeAngelis also spoke in support of the bill. No one disagreed with the statements of Senators Fawell and Luft that the amendment was a clarification of the original act.

In the House the bill was introduced by Representative Bugielski, who said this at the second reading:

"Thank you, Madame Speaker. Amendment No. 3 is an amendment that has been agreed upon after prolonged negotiations that have been taking place over the last month with the Department of Revenue and with the industry. House Bill 1982 clarifies existing law relative to the applicability of sales taxes on mandatory service charges imposed by hotels and restaurants, and what the legislation clarifies is that it specifies that whatever portion of the service charge or the tips that is turned over to any employee is exempt from the sales taxes. In the previous legislation it was a little ambiguous and all this will do is clean up the language and specifying [*sic*] exactly that the service charges that are paid out to the employee is not applicable to sales tax." 87th Ill. Gen. Assem., House Proceedings, May 23, 1991.

When the Speaker asked if anyone stood in opposition, Representative Kubik said, "Not necessarily in opposition, but I would like to ask the sponsor a question." Kubik then asked Bugielski whether the amendment was a clarification of or a change in existing law. He said he wanted to make sure "for legislative intent on this amendment." When Bugielski said the amendment was "clarifying" and represented an agreement that had been proposed by the Department, Kubik again said he wanted an answer "so that we have legislative intent on this issue." Bugielski read from something which described the amendment as "clarifying." Kubik said, "*We* want it understood that from this point for-

ward the law has been changed." (Emphasis added.) (87 Ill. Gen. Assem., House Proceedings, Mays 23, 1991.) The following more significant exchange took place:

> "KUBIK: Well, Representative, if—Madam Speaker, we can agree on this Amendment if we—I think if we work this out with the sponsor, and Representative Bugielski, if this is merely a clarification of the law, then we will—*then I'm not sure the Department will stand in support of this particular amendment. If it is a change of the law, they will be in support of the amendment, and that is, that is basically what we are trying to get at here.*

> McCRACKEN: Alright. It's a change in the law where it says—before it said, 'if all of the proceeds' and now it's 'to the extent that the proceeds'. So it'd be a change in the law in that section right there.

> KUBIK: So we have changed the law.

> McCRACKEN: Okay.

> KUBIK: We have changed the law?

> McCRACKEN: Yes.

> KUBIK: Okay. I think *we* now have an agreement. Thank you very much, and I stand in support of the amendment." (Emphasis added.) 87th Ill. Gen. Assem., House Proceedings, May 23, 1991.

At the third reading, Representative Bugielski still had the last word when he spoke as follows:

> "Thank you, Madam Speaker, Members of the House. As I mentioned before, House Bill 1982 *changes* the, you know, *clarifies* the existing law relative to the applicability of sales tax ***." (Emphasis added.) 87th Ill. Gen. Assem., House Proceedings, May 23, 1991.

The Department places great store in the remarks of Representative Kubik as an expression of legislative intent. We put none. It is the rule that a court in determining legislative intent may not consider statements made by those interested in passage of the law. (*Illinois Chiropractic Society v. Giello* (1960), 18 Ill. 2d 306, 164 N.E.2d 47.) It is obvious to us that Representative Kubik's words were those of a spokesman for the Department. It is as though the Director of the Department himself spoke. The only reasonable inference to be drawn is that the remarks of Representative Kubik and his insistence on the answer that he ultimately extracted from the other legislators were prompted by the Department, which had an eye on this litiga-

tion and any other litigation involving the same issue[2] and which anticipated foresightedly that a court might some day consider legislative debates in determining legislative intent. The Department, in short, was "making a record." By these observations we do not intend any criticism of either Representative Kubik or the Department.

■ For all these reasons, we conclude that the legislature never intended that section 2(e) be interpreted as the Department argued. Consequently, we further conclude that the trial judge should not have granted the Department's motion for summary judgment.

The plaintiff asks that we enter summary judgment in its favor. We refuse to do so. The judge properly denied the plaintiff's motion for summary judgment. We agree with the trial judge's finding that the legislature intended that "none of the monies collected [as service charges] were to be used to cover the employer's expenses and obligations." Shift pay is an obligation imposed on the employer regardless of whether a mandatory service charge is also imposed on the customer. It is to be treated the same as reimbursement for uniforms, vacation pay or any other benefits required of the employer under the union agreement or by law, such as social security taxes. We are not impressed by the plaintiff's argument that shift pay is really simply a bookkeeping convenience. Acceptance of that argument could lead to widespread avoidance of otherwise lawful taxes by imaginative accounting maneuvers. Moreover, the amendment supports our view that the legislature never intended to exempt an item such as shift pay. We conclude, therefore, that any amount paid to the Servers as shift pay was not exempt from the tax.

For these reasons, the judgment of the circuit court granting summary judgment to the Department is reversed; that part of the judgment denying summary judgment to the plaintiff is affirmed; this cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part; reversed in part and remanded.

McNAMARA and LaPORTA, JJ., concur.

---

[2]The plaintiff informs us that there are pending 10 other cases involving the same issue. The Department has asked us to disregard that statement of the plaintiff on the ground that it is not supported by anything in the record. There is, however, a reference to another case in the objection of JCAR to the Department's proposed rule.