# Illinois Official Reports

## Appellate Court

---

### *Commonwealth Edison Co. v. Illinois Commerce Comm'n,*
### 2014 IL App (1st ) 132011

---

| | |
|---|---|
| Appellate Court Caption | COMMONWEALTH EDISON COMPANY, Petitioner, v. ILLINOIS COMMERCE COMMISSION; CITIZENS UTILITY BOARD; THE CITY OF CHICAGO; and THE PEOPLE OF THE STATE OF ILLINOIS, Respondents. |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-13-2011, 1-13-2012 cons. |
| Filed | July 31, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action arising from a dispute over the interpretation of section 16-125(e) of the Public Utilities Act providing that an electric utility may be liable for damages suffered by customers when more than 30,000 customers are subjected to a continuous power interruption of four hours or more, the appellate court concluded that the statute is ambiguous and accepted, as a reasonable and permissible construction of the statute, the Illinois Commerce Commission's interpretation of section 16-125(e) as applying when 30,000 or more customers have their service interrupted during the same four-hour period and rejected the petitioning utility's contention that the statute applied only to single discrete interruptions that continuously interrupt power to over 30,000 of the same customers for the same four-hour period, and for purposes of the interruptions resulting from a storm that occurred on July 11, 2011, the utility was not entitled to a full waiver of liability pursuant to the exception allowed under section 16-125(e) for "unpreventable damage due to weather events or conditions," because the utility failed to meet its burden of establishing that the damages were unpreventable under the four decisional criteria advanced by the Commission. |
| Decision Under Review | Petition for review of orders of the Illinois Commerce Commission, Nos. 11-0588, 11-0662. |

| | |
|---|---|
| Judgment | Appeal No. 1-13-2011, Affirmed. |
| | Appeal No. 1-13-2012, Dismissed. |
| | |
| Counsel on Appeal | Thomas S. O'Neill, of Commonwealth Edison Company, Deborah Decker, of Exelon Company, John J. Hamill, Kathryn Hunt Muse, and Daniel T. Fenski, all of Jenner & Block, and E. Glenn Rippie, of Rooney Rippie & Ratnaswamy LLP, all of Chicago, for petitioner. |
| | |
| | Lisa Madigan, Attorney General, of Chicago (John P. Kelliher, Special Assistant Attorney General, of counsel), for respondent Illinois Commerce Commission. |
| | |
| | Lisa Madigan, Attorney General, of Chicago (Carolyn E. Shapiro, Solicitor General, and Evan Siegel, Assistant Attorney General, of counsel), for the People. |
| | |
| Panel | JUSTICE EPSTEIN delivered the judgment of the court, with opinion. Presiding Justice Howse and Justice Lavin concurred in the judgment and opinion. |

**OPINION**

¶ 1    In this consolidated appeal, petitioner Commonwealth Edison (ComEd), challenges two orders of respondent, the Illinois Commerce Commission (the Commission) interpreting and applying section 16-125(e) of the Public Utilities Act (220 ILCS 5/16-125(e) (West 2010)) (the Act) to power interruptions that resulted from a series of severe storm systems that hit northern Illinois in 2011 and caused damage to ComEd's electric delivery system. The Commission concluded that, pursuant to the language of section 16-125(e), ComEd was liable for damages to the affected consumers. However, with the exception of the storm that occurred on July 11, 2011, the Commission granted ComEd a waiver of liability under section 16-125(e)(1) of the Act where the power interruption resulted from "[u]npreventable damage due to weather events or conditions." 220 ILCS 5/16-125(e)(1) (West 2010).

¶ 2    ComEd now contends that the statute only applies where there is a continuous power outage caused by a *single* event that interrupts power to over 30,000 of the same customers for the same four-hour period and that the Commission erred in deciding that section 16-125(e)(1) applied to the "numerous dispersed and discrete interruptions at different times, in different places, and for different reasons." ComEd further contends that it is entitled to a full waiver of liability for the July 11, 2011 storm. ComEd also argues that the Commission unlawfully

- 2 -

precluded ComEd from recovering its cost of providing notice to the customers. For the reasons that follow, we dismiss appeal No. 1-13-2012 and affirm the Commission's decision in appeal No. 1-13-2011.

¶ 3                                    BACKGROUND

¶ 4       Several storm systems struck northern Illinois in 2011 causing significant damage to thousands of ComEd's customers. One of the storms occurred on February 1, 2011 (Winter 2011 Storm). Six storms occurred in the summer of 2011 (Summer 2011 Storms), specifically on June 8, June 21, June 30, July 11, July 22, and July 27, 2011. More than 2 million of ComEd's customers experienced a power interruption. After some customers made claims for damages resulting from the power outages, ComEd filed two verified petitions before the Commission. Docket No. 11-0588 was filed on August 18, 2011 and involved the Summer 2011 Storms. Docket No. 11-0662 was filed on September 29, 2011 and involved the Winter 2011 Storm. ComEd sought a determination of the applicability of section 16-125(e) of the Act, which provided, in pertinent part:

> "(e) In the event that more than *** 30,000 *** customers *** of an electric utility are subjected to a continuous power interruption of 4 hours or more that results in the transmission of power at less than 50% of the standard voltage, or that results in the total loss of power transmission, the utility shall be responsible for compensating customers affected by that interruption for 4 hours or more for all actual damages, which shall not include consequential damages, suffered as a result of the power interruption. *** A waiver of the requirements of this subsection may be granted by the Commission in instances in which the utility can show that the power interruption was a result of any one or more of the following causes:
>
> > (1) Unpreventable damage due to weather events or conditions." 220 ILCS 5/16-125(e) (West 2010).

ComEd sought a ruling that section 16-125(e) did not apply to the outages at issue because no one single interruption left 30,000 customers without electricity at the same time. In the alternative, ComEd argued that, even if the statute applies, any liability should be waived pursuant to subsection 16-125(e)(1) because the interruptions were "[u]npreventable damage due to weather events or conditions."

¶ 5       An administrative law judge (ALJ) held evidentiary hearings in July 2012. ComEd, the Commission's staff, and the office of the Illinois Attorney General (Attorney General) presented evidence. Respondents, City of Chicago and Citizens Utility Board, also appeared at the hearings.

¶ 6       The Commission issued its ruling in both cases on June 5, 2013. In two separate orders, the Commission determined that, by its plain and unambiguous language, section 16-125(e) applied to the outages related to the Summer 2011 Storms, as well as the Winter 2011 Storm. The Commission specifically found that "[s]ection 16-125(e) applies when 30,000 or more of ComEd's customers have their service interrupted during the same four-hour period." *Commonwealth Edison Co.*, Ill. Com. Comm'n Docket 11-0588, at 16 (Order June 5, 2013); *Commonwealth Edison Co.*, Ill. Com. Comm'n Docket 11-0662, at 18 (Order June 5, 2013). The Commission rejected ComEd's argument that the General Assembly intended section 16-125(e) to apply only to *single* discrete interruptions that continuously interrupt power to over 30,000 of the same customers for the same four-hour period.

¶ 7    In the Winter 2011 Storm case, docket No. 11-0662, the Commission further determined that ComEd was entitled to a waiver of liability under section 16-125(e)(1) where the evidence demonstrated that the great majority of the power interruptions that occurred were the result of "unpreventable damage due to weather events or conditions." (Internal quotation marks omitted.) *Commonwealth Edison Co.*, Ill. Com. Comm'n Docket 11-0662, at 23 (Order June 5, 2013). The Commission made a similar determination in the Summer 2011 Storms case, docket No. 11-0588, with the exception of the July 11, 2011 storm. Further, the Commission found that the 34,559 customers affected by the July 11, 2011 storm, as well as the municipalities in which the affected customers resided, were entitled to file for compensation under the Act. ComEd was directed to file a confidential document with the Commission identifying the customers or areas that would be entitled to file a claim. The Commission also required ComEd to work with the Commission's consumer services division in drafting, within 60 days, written notice to the affected customers informing them that they were entitled to seek damages. The Commission further concluded that the "[c]osts incurred in providing such notice, and all associated costs, shall not be included in rate base or treated as allowable expenses for purposes of determining the rates to be charged by the public utility."

¶ 8    On June 27, 2013, the Commission denied ComEd's petitions for rehearing in both cases. ComEd promptly appealed. ComEd filed an appeal (No. 1-13-2011) from the Commission's order pertaining to the Summer 2011 Storms in docket No. 11-0588; ComEd filed an appeal (No. 1-13-2012) from the Commission's order pertaining to the Winter 2011 Storm in docket No. 11-0662.

¶ 9    On July 29, 2013, the Commission filed a motion to dismiss individual appeal No. 1-13-2012, which pertained to docket No. 11-0662 and the Winter 2011 Storm. On August 6, 2013, this court entered an order stating that the motion would be taken with the case; on the same day the court allowed ComEd's motion to consolidate the two appeals.

¶ 10    MOTION TO DISMISS APPEAL NO. 1-13-2012

¶ 11    We first address the Commission's motion to dismiss appeal No. 1-13-2012, which we took with the case. The Commission, relying on well-established precedent, argues that the appeal must be dismissed because, in the underlying decision in docket No. 11-0662 (Winter 2011 Storm), ComEd was the prevailing party and received complete relief when the Commission granted ComEd's alternative request for a waiver of liability under section 16-125(e)(1) of the Act for "[u]npreventable damage due to weather events or conditions." In response, ComEd contends that a 1942 Illinois Supreme Court case, *Inter-State Water Co. v. City of Danville*, 379 Ill. 41 (1942), trumps all of the case law relied upon by the Commission and stands for the proposition that a party can appeal a Commission decision if the party is "affected" by the decision, even if not "aggrieved" by the decision. We disagree.

¶ 12    It is well established that "[c]ourts of review will not decide moot or abstract questions, will not review cases merely to establish precedent, and will not render advisory opinions." *Condon v. American Telephone & Telegraph Co.*, 136 Ill. 2d 95, 99-100 (1990) (concluding that issue of whether statute was unconstitutional was rendered moot by trial court's directed verdict in appellant's favor on issue of whether personnel guide was an implied contract). "The courts of Illinois do not issue advisory opinions to guide future litigation, and this court has adhered to this rule with few exceptions." *Golden Rule Insurance Co. v. Schwartz*, 203 Ill. 2d 456, 469 (2003). "Where a decision reached on the merits would render wholly ineffective

relief to the prevailing party, the court, in effect, has rendered an advisory opinion." *Schweickart v. Powers*, 245 Ill. App. 3d 281, 287-88 (1993). "It is fundamental that the forum of courts of appeal should not be afforded to successful parties who may not agree with the reasons, conclusion or findings below." *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 414 Ill. 275, 282-83 (1953) (explaining that if court determined that the appellant city was not adversely affected by the Commission's order it would have no appealable interest); see also *Geer v. Kadera*, 173 Ill. 2d 398, 414 (1996); *Strategic Energy, LLC v. Illinois Commerce Comm'n*, 369 Ill. App. 3d 238, 245 (2006); *Argonaut-Midwest Insurance Co. v. E.W. Corrigan Construction Co.*, 338 Ill. App. 3d 423, 427 (2003). "A party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for *** cannot appeal from the judgment." *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983); accord *Powell v. Dean Foods Co.*, 2012 IL 111714, ¶ 36. "The general rule is that the successful party cannot appeal from those parts of a decree that are in its favor in order to reverse other aspects of the decree." *Strategic Energy*, 369 Ill. App. 3d at 245.

¶ 13    *Inter-State Water Co.*, cited by ComEd, is distinguishable and limited to its facts. There, the utility, a water company, sought permission from the Commission to increase its rates. The utility prevailed, *i.e.*, an increase in rates was granted. The Commission had authorized only an increase in the domestic and industrial rates of the consumers and did not authorize an increase in the rates for water service furnished the appellant, the city of Danville. *Inter-State Water Co.*, 379 Ill. at 44. However, even though the appellant city was not directly impacted, it sought to appeal this *adverse* order. *Inter-State Water Co.* did not involve any issue as to whether the utility as the prevailing party could appeal from the order (which was not adverse to the utility). Rather, the issue on appeal was somewhat analogous to a question of standing in that "[t]he single question presented" was whether "the appellant, the city of Danville, had the legal and statutory right to appeal from the order of the Commerce Commission authorizing an increase in the domestic and industrial rates of the consumers of the appellee, the Inter-State Water Company, within the city." *Id*. The court determined that the appellant city was a "party affected" by the application for an increase of rates of a public utility within the city, and the interest did not terminate upon the entry of an order adverse to city's residents but favorable to the city itself, particularly where the resident consumers were not parties before the Commerce Commission. *Id*. at 48. Therefore, the city could appeal from such order. *Id*. at 51.

¶ 14    ComEd's position that *Inter-State Water Co.* stands for the proposition that a party can appeal a Commission decision if the party is "affected" by the decision, even if not "aggrieved" by the decision, is an inaccurate oversimplification of the holding. In the instant case, the Commission's determination that section 16-125(e) applied is more properly characterized as its "reasoning" and not an adverse "result." ComEd cannot appeal from the order in its favor in order to reverse other aspects of the order. Thus, appeal No. 1-13-2012 must be dismissed.

¶ 15                                           ANALYSIS

¶ 16    Turning now to appeal No. 1-13-2011, ComEd raises three arguments: (1) the Commission misinterpreted the statute as applying to an aggregate of customers affected by numerous distinct power interruptions and thereby erred in reaching the 30,000 customer threshold required under section 16-125(e); (2) the Commission erred in denying ComEd a full waiver of

liability under section 16-125(e)(1) for the July 11, 2011 customer outages; and (3) the Commission erred by prohibiting ComEd from recovering the costs of providing notice to customers. The Attorney General has filed a response brief in which it agrees with the Commission's liability determination. The Attorney General asserts that the Commission correctly interpreted the plain language of section 16-125(e) to find that ComEd was liable for the power outages, but takes no position on the issue of whether ComEd was entitled to a waiver of liability under section 16-125(e)(1).

¶ 17                    Interpretation and Application of Section 16-125(e)

¶ 18        As noted earlier, the parties disagree on the meaning of section 16-125(e). The Commission rejected ComEd's argument, now raised on appeal, that section 16-125(e) applies only to single, discrete interruptions that continuously interrupt power to over 30,000 of the same customers for the same four-hour period. The Commission and the Attorney General contend that the Commission correctly interpreted section 16-125(e) as applying when 30,000 or more of ComEd's customers have their service interrupted, *i.e.*, experience a power interruption, during the same four-hour period.

¶ 19        Courts review *de novo* the interpretation of a statute as a question of law. *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 332 (2008); *Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 247 (2004). The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent. *Rogers v. Imeri*, 2013 IL 115860, ¶ 13; *Harrisonville Telephone Co.*, 212 Ill. 2d at 251. The best indicator of the legislature's intent is the express language of the statute, which should be given its plain and ordinary meaning. *Id*. When the language of a statute is clear and unambiguous, it must be applied without resort to other aids of construction. *Alternate Fuels, Inc. v. Director of the Illinois Environmental Protection Agency*, 215 Ill. 2d 219, 238 (2004).

¶ 20        Where a statute is ambiguous, however, courts will give substantial weight and deference to an interpretation by the agency charged with the administration and enforcement of the statute. *Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n*, 95 Ill. 2d 142, 152 (1983); *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 656 (2005). "Ambiguity is, however, a prerequisite: the statute must be ambiguous." *Illinois Bell Telephone Co.*, 362 Ill. App. 3d at 657. If a statute is ambiguous, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." (Internal quotation marks omitted.) *Id*. Instead, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." (Internal quotation marks omitted.) *Id*. "A court will not substitute its own construction of a statutory provision for a reasonable interpretation adopted by the agency charged with the statute's administration." (Internal quotation marks omitted.) *Id*.

¶ 21        Our threshold task is to determine whether section 16-125(e) is ambiguous. Here, neither party contends that section 16-125(e) is ambiguous; each contends that the plain language of the statute supports its interpretation. We are not bound by the parties' agreement that the statute is not ambiguous. *Hyatt Corp. v. Sweet*, 230 Ill. App. 3d 423, 429 (1992). Yet, a statute is not ambiguous simply because the parties disagree as to its meaning. *Kaider v. Hamos*, 2012 IL App (1st) 111109, ¶ 11. A statute is ambiguous if its meaning cannot be interpreted from its plain language or if it is capable of being understood by reasonably well-informed persons in more than one manner. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 395-96 (2003); *People v.*

*Purcell*, 201 Ill. 2d 542, 549 (2002); *People v. Fort*, 373 Ill. App. 3d 882, 885-86 (2007) ("There are times when courts cannot determine the meaning of a statute by examining its plain language or when the statute is capable of being understood by reasonably well-informed persons in two or more different senses, thus creating statutory ambiguity."); see also *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 523 (2009) ("A statute is ambiguous if it may be reasonably read as expressing multiple meanings.").

¶ 22    The term "interruption" is not defined in the statute. Although the definition of a word in isolation is not necessarily controlling in statutory construction (*Italia Foods, Inc. v. Sun Tours, Inc.*, 2011 IL 110350, ¶ 12), we believe the definition of the word "interruption" is critical to ascertaining the legislature's intent in enacting section 16-125(e).

¶ 23                        ComEd's Interpretation of Section 16-125(e)

¶ 24    ComEd contends that the statute applies to a single interruption and the word "interruption" refers to a single break in service and, further, that the triggering interruption must be "continuous." As the Commission noted below, ComEd asserts that "[w]hether viewed individually or collectively, distinct breaks in the flow of power to customers that start at different times, end at different times, and affect different locations and areas (even widely different) are not continuous in any sense of the word." In support of its argument that the singular term "interruption" could not appropriately be used to encompass the many distinct interruptions, ComEd argued to the Commission that "no reasonable person in Highland Park who experiences an interruption on a stormy afternoon due to a tree limb falling on a wire can say that their interruption started hours earlier in Rockford when lightning struck a transformer. Nor could they say that their interruption persisted hours (or days) after their own service was restored, when the last storm-related interruption ended and the last of the damage was repaired." ComEd now argues that the Commission's determination that "multiple and discrete breaks in electrical current can constitute the same 'continuous interruption' so long as they each include at least four, common consecutive hours" is meritless based upon the plain language of section 16-125(e) and well-established principles of statutory interpretation.

¶ 25    ComEd notes that the statute uses the singular form of the word "interruption" in support of its position that the word refers to "a discrete event, caused by the failure of a piece of equipment or directly connected groups of equipment." From ComEd's viewpoint the ordinary meaning of "interruption" is consistent with the technical use of the term in the utility industry: "an event on a system that causes customers to lose their connection with the integrated grid to which generation is connected and the loss of service associated with that event."

¶ 26    Statutes should be interpreted to avoid impractical or absurd results. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 21. ComEd argues that the Commission's construction of the Act will lead to absurd results where "only one 'interruption' would occur where different customers from far distant locations within ComEd's territory lose power during a storm, irrespective of the divergent causes and durations of the interruptions and the different parts of ComEd's network serving the customers." This interpretation presumes that the legislature intended to use the industry definition, *i.e.*, *an event on the system* that causes customers to lose power or a *single* break in electric flow, when the legislature may just as well have intended interruption to mean the customer's loss of service.

¶ 27             The Commission's and the Attorney General's
                    Interpretation of Section 16-125(e)

¶ 28        Although the Commission and the Attorney General agree that section 16-125(e) applies here, they presented separate arguments in their briefs. For the sake of clarity, in this section, we shall combine and summarize their arguments as those of "respondents." Respondents assert that the statute focuses on the perspective of the consumer and the consumer experience, *i.e.*, that the *customer* be subjected to "a continuous power interruption" lasting four hours or more. The legislature used the number of customers ("30,000") and the duration of those customers' interruptions ("4 hours") as the threshold factors in order for the customer to seek damages. 220 ILCS 5/16-125(e) (West 2010). Each of those customers must be without service for four hours for the utility to be subject to a claim for compensation for actual damages. Respondents assert that "[t]he power loss was continuous" for each of the customers and the fact that the statute requires that 30,000 such customers are required to go without power for four hours or more "does not mean that each of them did not face an uninterrupted, four-hour blackout or significant power loss."

¶ 29        Respondents argue that the legislature was concerned with the continuous four-hour "interruption" experienced by the customer and that ComEd's view of the statute required the Commission to ignore the rules of English grammar. Respondents assert that the "customer" is the principal subject of action in the clause and the statute applies whenever that "customer" has lost power: (1) for four hours; (2) continuously; and (3) as part of a group larger than 30,000, all of whom were out of service during the same interval (four hours or more.) Nothing in the statute indicates that the legislature intended it apply only when a *single* incident leads to 30,000 customers experiencing an interruption in service. Defining the statute to apply where 30,000 customers are simultaneously and continuously without power for more than four hours is a reasonable interpretation of the statute. Respondents note that each customer at issue in the July 11, 2011 storm suffered an interruption lasting four hours at a time when more than 30,000 other customers suffered an interruption. Their position is not that multiple discrete interruptions are all the same outage or interruption but, rather, that when 30,000 customers simultaneously suffer a continuous interruption, *whether from a single cause or multiple causes*, the statute applies. Consumers, and what they experience from their perspective, is the essential focus of section 16-125(e).

¶ 30        Respondents contend that the legislature has taken a reasonable approach to measuring the effect of service interruptions on Illinois residents and businesses and providing an incentive to the utility to properly maintain its system to avoid widespread power interruptions. The statute requires that a threshold number of customers, 30,000, be affected. Once that threshold number has been reached, and applying English grammar, the statute requires that each customer be "subjected to *a* continuous power interruption." (Emphasis added.) 220 ILCS 5/16-125(e) (West 2010). Otherwise, if the plural form of the word "interruption" was used, *i.e.*, if the statute required that each customer be "subjected to continuous power interruption*s*," the statute would be internally inconsistent because a customer cannot experience more than one "continuous" power interruption. If a customer experienced more than one power interruption, it would not be "continuous." Using the plural would imply that each customer could aggregate the power interruptions that affected him to reach the four-hour threshold, while at the same time requiring that the interruptions be "continuous."

¶ 31    In sum, it is clear that each side is assigning its own meaning to the term "interruption" from two different viewpoints. ComEd views the word from the utility industry's viewpoint; the Commission and the Attorney General interpret the term from the customer's viewpoint. ComEd argues that singular term "interruption" in the statute could not appropriately be used to encompass the many distinct interruptions. The Commission and the Attorney General argue that ComEd reads the word "interruption" in isolation and "elevates its power system and equipment to central importance." They further assert that the plain language of the statute, read in its entirety, bases liability on how many consumers experience a power "interruption" ("30,000") and for how long ("4 hours"). 220 ILCS 5/16-125(e) (West 2010). We further note that the language "subjected to" does not help resolve the dispute because the phrase can be interpreted as requiring that the customers be subjected to either: (1) the discrete single event causing the loss of power (ComEd's interpretation) or (2) the loss of the customer's own service itself (respondents' interpretation).

¶ 32                          Section 16-125(e) Is Ambiguous

¶ 33    As noted earlier, a statute is ambiguous if its meaning cannot be interpreted from its plain language or if it is capable of being understood by reasonably well-informed persons in more than one manner. *Krohe v. City of Bloomington*, 204 Ill. 2d at 395-96. "In determining the plain, ordinary, and popularly understood meaning of a term, it is entirely appropriate to look to the dictionary for a definition." *People v. Bingham*, 2014 IL 115964, ¶ 55; see also *LeCompte v. Zoning Board of Appeals*, 2011 IL App (1st) 100423, ¶ 29 (where a statute does not define a term, this court will look to a dictionary to give a term its ordinary and popularly understood meaning). This court can find dictionary definitions to support either interpretation. For example, Webster's defines interruption as "an act of interrupting *or* state of being interrupted." (Emphasis added.) Webster's Third New International Dictionary 1182 (1993). The first of these supports ComEd's interpretation and defines interruption from the viewpoint of the utility; the second definition supports the Commission's interpretation and defines the term from the viewpoint of the customer. Two different definitions can also be found in Cambridge Learner's Dictionary, which defines interruption as "an occasion when an action or activity is interrupted, *or* something that interrupts someone or something." (Emphasis added.) http://dictionary.cambridge.org/dictionary/learner-english/interruption. The definition using the word "occasion" comports with the customer's interruption, while the phrase "something that interrupts" is consonant with the industry viewpoint of interruption as a single, discrete event on the system. The existence of different or alternative dictionary definitions of a word, each of which would make sense in a statute, itself indicates that the term is ambiguous and the statute is open to interpretation. *Home Star Bank & Financial Services v. Emergency Care & Health Organization, Ltd.*, 2014 IL 115526, ¶ 39; accord *Landis v. Marc Realty, L.L.C.*, 235 Ill. 2d 1, 11 (2009); see also *People v. Elliott*, 2014 IL 115308, ¶ 13 (noting that the various dictionary definitions, "[i]n short, rather than resolv[ing] the issue at hand, *** simply underscore[d] the problem"). In the instant case, the dictionary definitions are unhelpful to our analysis and, given the multiple definitions, lend support to our determination that the statute is ambiguous. In sum, defining interruption as "an *act* of interrupting" or "*something* that interrupts" supports ComEd's interpretation while defining interruption as a "*state of being* interrupted" or "*an occasion* when an action or activity is interrupted" supports the Commission's and the Attorney General's interpretation. The word "interruption" means

something different to a utility than it does to a customer. To the utility, an interruption is an *event* on a system that causes customers to lose their connection with the integrated grid. From the customer's perspective, he is subjected to a power interruption when *his* service is in the state of being interrupted.

¶ 34                    This Court Cannot Rewrite the Statute

¶ 35    "[I]t is a cardinal rule of statutory construction that we cannot rewrite a statute, and depart from its plain language, by reading into it exceptions, limitations or conditions not expressed by the legislature." (Internal quotation marks omitted.) *Crittenden v. Cook County Comm'n on Human Rights*, 2012 IL App (1st) 112437, ¶ 81 (quoting *People ex rel. Birkett v. Dockery*, 235 Ill. 2d 73, 81 (2009)), *aff'd*, 2013 IL 114876. Each side here contends that the opponent(s)' interpretation of the statute requires that it be rewritten. In sum, ComEd focuses on the necessity of adding the word "simultaneous" to the definition of interruption because the Commission used the word in its order.[1] Respondents focus on the necessity of adding the word "single" to the definition of interruption.

¶ 36    Respondents assert that if the legislature meant to limit liability to cases where there was a single interruption or incident resulting in at least 30,000 customers being out of service for at least four hours, the statute would read:

> "*In the event that a single continuous power interruption results* in the transmission of power at less than 50% of the standard voltage, or results in the total loss of power transmission affecting more than 30,000 customers of an electric utility for 4 hours or more, the utility shall be responsible for compensating customers affected by that interruption for 4 hours or more for all actual damages."

Respondents note that this is not the language of the statute and argue that ComEd's interpretation requires that the statute be rewritten.

¶ 37    ComEd argues that the Commission interpreted the statute to permit aggregation of any interruptions that occur "continuously and simultaneously." Again, this interpretation presumes that the legislature intended in the first instance to use the industry definition of interruption, *i.e.*, *an event on the system* that causes customers to lose power or a *single* break in electric flow, when the legislature may just as well have intended interruption to mean the customer's loss of service.

¶ 38    ComEd has also argued that "[a] single-interruption reading is so intuitive that this Court previously presumed and recognized it." In *Sheffler v. Commonwealth Edison Co.*, 399 Ill. App. 3d 51 (2010), *aff'd*, 2011 IL 110166, cited by ComEd, this court stated that "[s]ection 16-125(e) provides a series of specific circumstances under which, in the event of a *single* power interruption that affects more than 30,000 customers, an affected customer that lost power may be entitled to actual damages." (Emphasis added.) *Id.* at 75. We agree with the Commission that this statement was *obiter dictum*, *i.e.*, a remark uttered "by the way" on a collateral point not directly concerning the question before the court. *Cates v. Cates*, 156 Ill. 2d 76, 80 (1993). *Sheffler* was a class action brought against ComEd by consumers of electrical power who sought legal and equitable relief following power outages caused by severe storm

---

[1]The Commission did not use the word "simultaneous" in the portion of its order addressing the applicability of section 16-215(e) but did use it in the portion of the order addressing whether it should grant ComEd a waiver of liability under subsection 16-215(e)(1).

systems. The trial court dismissed the complaint, this court affirmed, and the Illinois Supreme Court later affirmed. There was no discussion of the issue of whether the statute applied to a "single" power interruption; there was only the one remark. We agree with the Commission that the statement "could have been deleted without seriously impairing the analytical foundations of the holding." See *Pajic v. Old Republic Insurance Co.*, 394 Ill. App. 3d 1040, 1048 (2009) (describing the term "*obiter dictum*"). "[B]eing peripheral, [it] may not have received the full and careful consideration of the court that uttered it. [Citations.]" (Internal quotation marks omitted.) *Id*.

¶ 39     We conclude that the statute is ambiguous. Section 16-125(e) can reasonably be construed both in the manner that the Commission and the Attorney General propose, as well as the manner that ComEd proposes. We believe that the Commission's interpretation of section 16-125(e) was a reasonable and permissible construction of the statute. Unless and until the legislature chooses to rewrite the statute in the manner suggested by either side, we will not substitute our own construction for the reasonable interpretation adopted by the agency charged with the statute's administration. We affirm the Commission's decision that section 16-125(e) applies in the instant case.

¶ 40                     The Commission's Denial of a Waiver Under Section 16-125(e)(1)

¶ 41     Having determined that the Commission did not erroneously apply section 16-125(e) to the power interruption experienced by the more than 30,000 customers on July 11, 2011, we next address ComEd's argument that it was entitled[2] to a full waiver of liability under subsection 16-125(a)(1) where the July 11, 2011 power interruption was due to "[u]npreventable damage due to weather events or conditions." ComEd argues that "the Commission imposed liability despite making exculpatory findings that ComEd met every duty imposed on it and without making any fact findings that ComEd did not act in accordance with good utility practice."

¶ 42     The Commission articulated the standard for determining whether damage was "unpreventable." In its order, under its analysis of whether ComEd was entitled to a waiver of liability, the Commission expressly stated that it had adopted the four decisional criteria advanced by Commission staff. To meet its burden of proving that damage was unpreventable, the utility must demonstrate that: "(1) the facilities involved with the interruptions were appropriately designed, constructed and maintained; (2) the weather conditions or events in question occurred[,] at or near outage locations[,] that exceeded the standards to which the utility's system were appropriately designed, constructed, and maintained; (3) the particular outages at issue were caused by damage resulting from the weather events or conditions that

---

[2]Both ComEd and the Commission address the issue in terms of whether ComEd was "entitled" to a waiver. We note, however, that the statute states that "[a] waiver *** *may* be granted by the Commission." (Emphasis added.) 220 ILCS 5/16-125(e)(1) (West 2010). Legislative use of the word "may" is generally regarded as indicating a permissive or directory reading, whereas use of the word "shall" is generally considered to express a mandatory reading. See, *e.g.*, *People v. One 1998 GMC*, 2011 IL 110236, ¶ 16. Also, section 16-125(e) contains both the word "shall" and the word "may." "When the legislature has used both may and shall in the same paragraph of a statute, a court infers that the legislature acknowledged the difference and intended each word to carry its ordinary meaning." 3 Norman J. Singer & J.D. Shambie Singer, Sutherland on Statutory Construction § 57.3, at 22-23 (7th ed. 2008). Since the legislature's use of the word "may" in the statute has not been raised as an issue here, we need not address it further.

exceeded appropriate design standards; and (4) the utility's restoration effort was reasonable and did not contribute to the number or length of interruptions."

¶ 43    On appeal, ComEd does not dispute that, as the party seeking relief from liability, it had the burden of proof. Despite the clearly articulated standard above, ComEd now asserts that "all parties agreed below that the essence of [the meaning of 'unpreventable'] is a prudential and reasonableness standard based on good utility practice." ComEd further asserts that it showed that damage is "unpreventable if it occurred on a system designed, constructed, and operated in accordance with good utility practice … and with the utility's obligation to invest and incur operating expenses in a manner that is reasonable and prudent." ComEd contends that this was the standard applied in the Winter 2011 Storm case and additionally asserts that "the Commission neither articulated nor applied a clear and consistent alternative definition of unpreventable." This argument ignores the express language of the Commission's order.

¶ 44    As noted earlier, in deciding whether ComEd had met its burden of showing it was entitled to a waiver of liability, the Commission *expressly stated* that it had adopted the four decisional criteria advanced by Commission staff. The Commission further explained that the decisional criteria had been advanced by staff "in this and several previous proceedings."

¶ 45    Staff witness Greg Rockrohr was asked, "What factors should the Commission consider to determine whether ComEd customers experienced interruptions as a result of unpreventable damage from the Summer 2011 Storm Systems?" Rockrohr stated that, "In Docket No. 08-0044, Staff described four showings that a utility should make in its request for a waiver so that the Commission can adequately evaluate the Company's request." Rockrohr agreed with staff's prior recommendation and suggested the Commission base its decision regarding ComEd's waiver request upon those four decisional criteria, which the Commission subsequently adopted. In his testimony, Rockrohr also provided the rationale for each of the four decisional criteria.

¶ 46    Regarding the first criterion, that ComEd show that "the facilities involved with the interruptions were appropriately designed, constructed and maintained," Rockrohr explained that "[t]he ability of electric distribution facilities to withstand adverse weather conditions or events is largely a function of the design and maintenance of those facilities." He opined that "[i]f the damage would not have occurred to facilities that were appropriately designed, constructed and maintained, then such damage cannot be classified as unpreventable."

¶ 47    Rockrohr also testified regarding the second criterion, *i.e.*, ComEd's burden to show "the weather conditions or events in question occurred[,] at or near outage locations[,] that exceeded the standards to which the utility's system were appropriately designed, constructed, and maintained." As Rockrohr explained: "If a utility's facilities experienced conditions or events that exceeded the standards to which the facilities were appropriately designed, constructed, and maintained, then damage resulting from such conditions or events could be considered unpreventable from an engineering perspective." "Conversely, if the utility does not establish that its facilities were subjected to weather conditions or events that exceeded appropriate design standards, then it has not established that the damage which occurred due to those conditions was unpreventable."

¶ 48    Regarding the third decisional criterion for determining whether damage was unpreventable, namely, whether the particular outages at issue were caused by damage resulting from the weather events or conditions that exceeded appropriate design standards, Rockrohr testified as follows:

"From an operating perspective, it is neither reasonable nor feasible to expect a utility to be able to provide direct and specific evidence regarding the cause of each interruption. That is, a utility typically obtains information about damage causing an interruption by viewing the damage after it has already occurred. While an after-the-fact damage assessment will sometimes allow the utility to reasonably assess the cause of the damage (for instance, when an uprooted tree is observed on top of downed power lines), it will sometimes be difficult to determine the exact cause of the damage from an after-the-fact viewing of the facilities (for instance, where a line fuse operates and there is no evidence of animal activity or tree limbs in contact with the conductor). At a minimum, the utility should be able to make some showing that the damage causing the interruptions was consistent with, and likely caused by, damage from the applicable weather conditions."

¶ 49    Lastly, Rockrohr provided an example with respect to the last criterion, whether the utility's restoration effort was reasonable and did not contribute to the number or length of interruptions. As Rockrohr explained, "[if] the utility could have reasonably restored power in 10 minutes, but did not restore power for 10 hours and 10 minutes, then 10 hours of the interruption was preventable."

¶ 50    We conclude that the Commission articulated a standard for determining whether the July 11, 2011 continuous power interruption experienced by more than 30,000 customers was due to "[u]npreventable damage due to weather events or conditions." Contrary to ComEd's assertion, the standard was neither inconsistent nor vague. ComEd's failure to acknowledge the standard necessarily affects its related argument that ComEd was entitled to a waiver because it "met every duty imposed on it." The Commission, applying its articulated standard, determined that ComEd was not entitled to a waiver because the July 11, 2011 interruption was not due to "[u]npreventable damage due to weather events or conditions." The Commission took into account staff's analysis of outages that used ComEd's own outage codes and took into account wind conditions to grant waivers for damage caused by lightning, uprooted trees, broken tree limbs and wind/tornado when winds exceeded 60 miles per hour. As the Commission now notes, the final number of customers experiencing simultaneous outages not covered by a waiver was 34,559 and approximately 25,600 of these resulted from "tree contact."

¶ 51    ComEd also contends that, although the Commission determined that not all damage caused by "broken tree limbs" could be prevented, the Commission "never explained" why all damage caused by "tree contact" was preventable. We disagree. It is clear from the Commission's decision that it concluded that ComEd could and should have trimmed the trees to prevent limbs from swaying into power lines.

¶ 52    ComEd had the burden of showing that the outages caused by tree contact were unpreventable. ComEd did not meet its burden. As the Commission notes, by adopting staff's decisional criteria (which explained the reason for its waiver exclusions) the Commission did in fact explain why damage caused by tree contact was preventable. Although the Commission's order does not explicitly discuss staff testimony rejecting waivers for damages caused by tree contact, the Commission, in reaching its conclusions, relied on Rockrohr's detailed examination of the outages for which ComEd sought waivers. Rockrohr based his analysis on data provided by ComEd and he opined that ComEd did not show that the damage due to tree contact was unpreventable.

- 13 -

¶ 53        Rockrohr was asked why he excluded outages caused by "tree contact" from the waiver he had recommended. As he explained:

> "When trimming the trees that grow adjacent to overhead distribution circuits, electric utilities must take winds into account and adequately trim branches and limbs so that winds do not blow limbs and branches that remain connected to the trees into the power lines. Furthermore, the winds discussed above are typically not sustained; they are gusts lasting only a few seconds, and I believe ComEd could and should have trimmed trees to prevent limbs from swaying into power lines. It is my opinion that, generally, interruptions caused by tree contacts are preventable, whereas, an interruption caused by a properly trimmed limb that breaks off and falls into the power lines would be unpreventable if wind speeds approach or exceed utility design standards."

¶ 54        As the Commission now notes, substantial evidence provided by the Commission staff supported its decision that, even with unpreventable damage considered, there were more than 30,000 customers who suffered an interruption simultaneously and continuously for more than four hours due to the July 11, 2011 storm. "Substantial evidence" means more than a mere scintilla but does not have to rise to the level of a preponderance of the evidence. See, *e.g.*, *Pliura Intervenors v. Illinois Commerce Comm'n*, 405 Ill. App. 3d 199, 207 (2010); *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 398 Ill. App. 3d 510, 514 (2009). It is not the province of this court "to weigh the evidence and reach a conclusion; that is for the Commission to do." *Baltimore & Ohio Chicago Terminal R.R. Co. v. Illinois Commerce Comm'n*, 55 Ill. App. 3d 915, 920 (1977). As noted earlier, "[t]he credibility of expert witnesses and the weight to be given their testimony are matters for the Commission as the finder of fact." *Apple Canyon Lake Property Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 70. "Illinois courts give great deference to the Commission's decisions, as they are the judgments of an administrative body with tremendous expertise in the field of public utilities and with the qualifications to interpret specialized and highly technical evidence." *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 343 Ill. App. 3d 249, 255 (2003). Notably, despite its burden, ComEd has not cited any contrary testimony indicating that damage from tree contact is generally unpreventable.

¶ 55        ComEd has noted that the Commission granted it a full waiver in the Winter 2011 Storm case where ComEd "was in compliance with its comprehensive vegetation management program–which had been vetted by the Commission." ComEd now argues that "[t]he Commission *never explained* what changed with respect to ComEd's vegetation management in the few short months between the February blizzard and the Summer Storms." (Emphasis added.) Although ComEd attempts to use the Commission's determination in February 2011 to support an inference that ComEd was still in compliance with its vegetation management program after spring and partial summer growing cycles, the Commission notes that in the Winter 2011 Storm case, tree contact outages were not sufficiently numerous to bring the preventable outage number above the 30,000 customer level. Tree contact was not an issue in the Winter 2011 Storm case. By contrast, in the July 11, 2011 outage, there were more than 25,000 customers whose outage was caused by tree contact. It is therefore understandable and reasonable that the Commission had not, until the Summer 2011 Storms case, needed to address whether outages from tree contact represented a category of preventable causes. The

Commission was entitled to rely on staff testimony in determining that tree contact outages were preventable.

¶ 56    ComEd has also raised two constitutional arguments. The first is a due process argument based on the Commission's purported failure to articulate a clear standard. As noted earlier, the Commission expressly stated that it had adopted the four decisional criteria advanced by staff, *i.e.*, the utility, to meet its burden of proving damage was unpreventable, must demonstrate that: "(1) the facilities involved with the interruptions were appropriately designed, constructed and maintained; (2) the weather conditions or events in question occurred[,] at or near outage locations[,] that exceeded the standards to which the utility's system were appropriately designed, constructed, and maintained; (3) the particular outages at issue were caused by damage resulting from the weather events or conditions that exceeded appropriate design standards; and (4) the utility's restoration effort was reasonable and did not contribute to the number or length of interruptions." We conclude that the Commission articulated a clear standard and ComEd's due process argument is meritless.

¶ 57    ComEd's second constitutional argument is that the Commission's construction of section 16-125(e) results in an unconstitutional taking of property without just compensation and due process under the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV) and the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, §§ 2, 15). ComEd asserts that the Commission determined that ComEd must pay claims for damages even though, according to ComEd, it violated no duty imposed upon it and the costs were prudently incurred.

¶ 58    ComEd cites *Duquesne Light Co. v. Barasch*, 488 U.S. 299 (1989), for the general proposition that "[i]f the rate [set for a public utility] does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments." *Id.* at 308. ComEd also cites *Citizens Utility Board v. Illinois Commerce Comm'n*, 166 Ill. 2d 111 (1995), in which the Illinois Supreme Court noted that a utility's "prudently incurred operating expenses have traditionally been recoverable from ratepayers." *Id*. at 126.

¶ 59    As the Commission notes, in Illinois, the issue of unlawful taking is typically raised in the rate setting context. See, *e.g.*, *Sprague v. Biggs*, 390 Ill. 537 (1945) (holding that base rates which do not produce income sufficient to meet the operating expenses of a public utility are confiscatory); *Monarch Gas Co. v. Illinois Commerce Comm'n*, 261 Ill. App. 3d 94, 99 (1994) (noting that a Commission order would be "confiscatory" only where it sets the base rate at such a low level that the utility is unable to pay its operating expenses). This is not a rate case and ComEd has cited no additional authority. More importantly, however, ComEd has failed to show that the Commission's order holding ComEd responsible for compensating customers for preventable damages pursuant to section 16-125(e) amounts to an unconstitutional taking. We reject ComEd's argument that these damages−for the large-scale outage that was shown to be preventable−constitute reasonably incurred costs.

¶ 60                    The Commission's Decision Prohibiting Recovery
                              of Costs of Customer Notice

¶ 61    ComEd also argues that it should not be required to provide notice to the affected customers informing them that they are entitled to seek damages, without ComEd being able to

- 15 -

recover its costs in providing notice. The Commission order stated that "[c]osts incurred in providing such notice, and all associated costs, shall not be included in rate base or treated as allowable expenses for purposes of determining the rates to be charged by the public utility." *Commonwealth Edison Co.*, Ill. Com. Comm'n Docket 11-0588, at 30 (Order June 5, 2013). ComEd contends that the Commission cited no authority to support that limitation.[3] ComEd acknowledges that section 16-125(e) provides that "[l]oss of revenue and expenses incurred in complying with this subsection may not be recovered from ratepayers." ComEd argues that the only "expenses" that cannot be recovered are the "actual damages" which are mentioned in the statute and not the "costs of providing notice" which do not appear in the statute. Apparently, ComEd contends that any expenses it incurs in providing the notice is *not* an expense incurred "in complying with this subsection [16-125(e)]" but, rather, is an expense incurred in complying with the Commission's order. Yet, the Commission's order was based on its finding that ComEd violated, *i.e.*, failed to comply, with this subsection. We believe that any difference between expenses incurred "in complying" and "for failing to comply" with this subsection is a distinction without a difference. We reject ComEd's novel argument. The Commission's determination that ComEd could not recover its costs incurred in providing the notice, is consistent with the plain language in section 16-125(e) prohibiting the recovery of losses of revenue and expenses incurred in complying with the statute.

¶ 62                                                    CONCLUSION

¶ 63       For the foregoing reasons, we affirm the Commission's decision in appeal No. 1-13-2011. We grant the Commission's motion that was taken with the case and dismiss appeal No. 1-13-2012.

¶ 64       Appeal No. 1-13-2011, Affirmed.
¶ 65       Appeal No. 1-13-2012, Dismissed.

---

[3]ComEd does not challenge the Commission's authority to order it to provide notice.