# Illinois Official Reports

## Appellate Court

***Coalition to Request Equitable Allocation of Costs Together (REACT) v. Illinois Commerce Comm'n*, 2015 IL App (2d) 140202**

| | |
|---|---|
| Appellate Court Caption | THE COALITION TO REQUEST EQUITABLE ALLOCATION OF COSTS TOGETHER (REACT), Petitioner, v. ILLINOIS COMMERCE COMMISSION, COMMONWEALTH EDISON COMPANY, THE BUILDING OWNERS AND MANAGERS ASSOCIATION, THE CHICAGO TRANSIT AUTHORITY, THE CITIZENS UTILITY BOARD, THE CITY OF CHICAGO, THE COMMERCIAL GROUP, THE ILLINOIS INDUSTRIAL ENERGY CONSUMERS, KROGER COMPANY, NORTHEAST ILLINOIS REGIONAL COMMUTER RAILWAY CORPORATION d/b/a Metra, NUCOR STEEL KANKAKEE, THE PEOPLE OF THE STATE OF ILLINOIS, and THE UNITED STATES DEPARTMENT OF ENERGY, Respondents. |
| District & No. | Second District<br>Docket No. 2-14-0202 |
| Filed | March 6, 2015 |
| Decision Under Review | Petition for review of order of Illinois Commerce Commission, No. 13-0387. |
| Judgment | Affirmed. |

| | |
|---|---|
| Counsel on Appeal | Christopher J. Townsend, Christopher N. Skey, and Adam T. Margolin, all of Quarles & Brady LLP, of Chicago, for petitioner. |
| | John P. Kelliher, of Illinois Commerce Commision, of Chicago, for respondent Illinois Commerce Commission. |
| Panel | JUSTICE JORGENSEN delivered the judgment of the court, with opinion. Presiding Justice Schostok and Justice Hutchinson concurred in the judgment and opinion. |

**OPINION**

¶ 1   In 2013, the Illinois Commerce Commission (Commission) approved the performance-based formula rate that Commonwealth Edison (ComEd) proposed to apply to its various customer classes. Petitioner, The Coalition to Request Equitable Allocation of Costs Together (REACT), appeals. We affirm the Commission's ruling, because: (1) the Commission did not err in interpreting the requirements of the statute; (2) the evidence substantiated the Commission's finding that a cost-based rate design did not require further segmenting the primary-voltage level of service by phase of service; and (3) the Commission reasonably found that the benefits of a further study on the question did not outweigh the costs.

¶ 2                              I. BACKGROUND

¶ 3   The instant case arises out of a 2013 rate-design, or cost-allocation, proceeding before the Commission, wherein the Commission evaluated the performance-based formula rate that ComEd proposed to apply to its various customer classes. 220 ILCS 5/16-108.5(c) (West 2012). Section 16-108.5(c) of the Public Utilities Act (Act) is part of what is commonly referred to as the 2011 Energy Infrastructure Modernization Act (EIMA). EIMA requires the Commission to periodically consider revenue-neutral tariff changes related to the rate design of a participating utility's performance-based formula rate. *Id*. The *total* rate, or total amount due to the utility from all of its customer classes, is evaluated annually through formula rate cases. *Id*. The rate design or cost allocation, as is at issue here, is evaluated once every three years in its own proceeding. *Id*. Any changes in allocation are called "revenue neutral" because the total revenue requirement remains the same and only the allocations among the customer classes may change. Because only the allocations change, the rate-design inquiry has been described as a "zero sum game." The goal is to satisfy ComEd's revenue requirement in a manner that is fair to all 15 of its customer classes.

¶ 4   REACT disagrees that the proposed rate design is fair to the two customer classes that comprise its membership, the "Extra Large Load" (ELL) class and the "High Voltage (Over 10 MW)" (HV over 10 MW) class. REACT formed in 2007 to fight what it viewed as a disproportionate rate design, or cost allocation, that included a proposed rate increase for

members of the ELL and HV over 10 MW classes of 140% and 129%, respectively. As a comparison, the proposed rate increase for other classes ranged between 7.5% and 30% (excluding the "High Voltage (Other)" class and the railroad class, which, for reasons to be discussed later, was viewed by both ComEd and the Commission as a "unique class"). In ComEd's view, however, what REACT viewed as a disproportionate rate increase was actually a correction. The proposed increase was an attempt to eliminate the other classes' existing subsidization of costs caused by the ELL and HV over 10 MW classes.

¶ 5    ComEd has based its proposed rate design on an evolving embedded-cost-of-service study (ECOSS). Since 2007, REACT and other interested parties have been challenging–and the Commission has been reviewing and ordering the refinement of–that ECOSS. Finally, in the 2013 order from which REACT now appeals, the Commission found the ECOSS sufficiently refined to support the proposed rate design (at least as to the cost-allocation principles at issue here). Before addressing the 2013 order, we first recap the preceding orders, from 2007, 2008, and 2010. In each of those orders, which were entered before the EIMA was enacted, the *total* amount due *as well as* the allocation, or rate design, were evaluated in a single proceeding. Our summary, however, focuses on the allocation, or rate design, issues. As will become apparent, in those earlier proceedings, the Commission was concerned with differentiating primary-versus secondary-voltage levels of service. In the 2013 proceeding, however, it was satisfied with the differentiation and declined to further segment the levels of service.

¶ 6                              A. 2007 Rate Case

¶ 7    In the 2007 rate case (No. 07-0566), the Commission found the ECOSS deficient for its failure to differentiate between primary and secondary service levels:

> "ComEd's network can be divided into primary and secondary service on the basis of voltage. Some customers take electric service at high voltage only. These are primary customers. They comprise [0].2% of customers, yet they represent 20% of the system's peak demand. *** ComEd fails to separately allocate these [the cost of maintaining the secondary system] to secondary customers. Intervenors representing primary customers allege that about $88 million of these costs are allocated in error to primary customers, significantly raising their cost of service. ***
> ***
> ComEd admits that the assignment of primary and secondary distribution costs would likely reduce the total cost allocation to [primary] customers in the [ELL, HV], and Railroad delivery classes. Although admitting on cross examination that it did not know how expensive this analysis would be, ComEd, nevertheless argues that the cost of the primary[/]secondary analysis exceeds the benefits because the benefits would flow to a small number of customers. This overlooks our explicit policy objective of assigning costs where they belong. ***
> * * *
> Having considered the evidence and arguments of the parties, the Commission finds that the ECOSS is deficient in not separating and properly allocating primary and secondary service costs." Commonwealth Edison Co., No. 07-0566, at 206-07 (Sept. 10, 2008).

- 3 -

¶ 8        The Commission ordered ComEd to further refine the ECOSS based on a proper allocation of primary- and secondary-level costs. The Commission found it important to separate primary and secondary customers, because, while "the vast majority of ComEd's customers take service at lower voltages that utilize its extensive distribution system, a small number of customers take service at higher voltages that bypass significant portions of the distribution infrastructure. Their cost of service is therefore lower on a per kilowatt basis. The rates charged these primary system customers should reflect this lower cost of service." Commonwealth Edison Co., No. 08-0532, at 35 (Apr. 21, 2010). The Commission initiated a "special investigation proceeding" on the issue, to be heard in 2008. In the meantime, the Commission authorized ComEd to move its rates for the ELL and HV over 10 MW classes 25% closer to the increases proposed in the ECOSS.

¶ 9                              B. The 2008 Special Investigation Proceeding

¶ 10        In the 2008 special investigation proceeding (No. 08-0532), the Commission recognized that it would first need to *define* primary- versus secondary-distribution systems, so as to mark the cutoff between the two. ComEd offered that the Commission had historically accepted its position that a primary system is defined as consisting of facilities used to distribute electricity at voltages of 4 kV or higher and less than 69 kV. A secondary system is defined as consisting of facilities used to distribute electricity at voltages of less than 4 kV.

¶ 11        The opposition, particularly the Illinois Industrial Energy Consumers (IIEC), did not necessarily disagree that 4 kV was a proper cutoff. However, among other points, it argued that it is difficult to consistently apply that standard, because certain primary facilities, particularly "single-phase primary voltage level circuits," are often used exclusively to provide service at secondary voltages.[1] In other words, certain primary customers generally do not use the single-phase lines. The Commission was not convinced.

¶ 12        The Commission noted: "The bottom line is that there is no hard and fast dividing line between primary and secondary voltages. The separation between the two is based on judgment." *Id.* at 36. The Commission agreed to make 4 kV the dividing line and directed ComEd to incorporate that decision into its next ECOSS. It noted that further refinement was needed, however, and it directed ComEd to provide the following in the next rate proceeding: (1) the results of direct observation, or sampling and estimation, to develop more accurate and transparent differentiation of primary and secondary costs; (2) other utilities' methods of differentiating primary and secondary systems and costs; (3) function-based definitions of service voltages; (4) an analysis of which customer groups are served by which system's service components; and (5) consideration of redefining rate classes on the basis of voltage or equipment usage to better reflect the cost of service. *Id.* at 40.

¶ 13                                     C. 2010 Rate Case

¶ 14        In the 2010 rate case (No. 10-0467), IIEC again raised its argument that single-phase primary-circuit costs should be reallocated to secondary users. IIEC explained that, "[i]n electrical distribution systems, the term 'phase' simply refers to an energized conductor.

---

[1]REACT appears to build upon this argument as the basis for the instant appeal.

Single-phase primary distribution circuits are composed of a single conductor that is energized to a primary voltage level, and a ground or neutral conductor. Three-phase primary distribution circuits consist of three energized conductors and a ground or neutral conductor." Commonwealth Edison Co., No. 10-0467, at 174 (May 24, 2011). Further, "because of the potential for load and voltage imbalances [within the system], utilities rarely choose to use single phase primary circuits to serve primary voltage customers." (Internal quotation marks omitted.) *Id.* at 176. Though IIEC carried the argument's banner, REACT also urged that the primary and secondary delineations needed further segmentation based on each customer class's usage of primary-system components. The Commission rejected the argument, stating that, "at this time, these costs do not appear to be as neatly (and fairly) segregable as the IIEC asserts." *Id.*

¶ 15    The Commission did find, however, that ComEd did not sufficiently comply with several of the five directives set forth in the 2008 special investigation order. For example, ComEd sent agents to directly observe only a very small portion of the facilities and otherwise relied on existing data. Additionally, although ComEd claimed to have looked to 35 other utility companies nationwide to see how they allocated costs between primary and secondary systems, it did not submit sufficient evidence as to *how* these utilities allocated said costs. The Commission's staff (Staff) had opined that most of these utilities used a specific voltage (primarily 4 kV) as the dividing line between the two groups, as ComEd had done. Still, the Commission reiterated that ComEd should have more thoroughly demonstrated the knowledge gained from examining the other utilities' methods so as to ensure the development of a meaningful primary/secondary split.

¶ 16    Despite these shortcomings, the Commission declined the requests by IIEC and REACT to invalidate the ECOSS.[2] The Commission stated that, once ComEd fully complied with the 2008 directives, "further segmentation of ComEd's costs *may* be necessary, depending upon the outcome." (Emphasis added.) *Id.* For the purposes of the 2010 rate case, however, the Commission found the ECOSS to be "greatly improved over what ha[d] been previously submitted in other dockets." *Id.* at 264. It found the ECOSS "accurate enough" to support another 25% move toward the 2007 proposed rate increases. *Id.* In fact, it found, the ECOSS supported *greater* movement, but the Commission reasoned that a more modest 25% move was "consistent with the principle of gradualism, which avoids rate shock." *Id.*

¶ 17                              D. The 2013 Rate-Design Proceeding

¶ 18    In the 2013 rate-design proceeding (No. 13-0387), at issue in this appeal, the Commission evaluated only rate design, or allocation. REACT again urged that the primary and secondary delineations needed further segmentation based on each customer class's usage of primary-system components. Specifically, REACT believed that primary service should be further segmented by phase of service. As IIEC had noted in previous proceedings, REACT contended that members of the ELL and HV over 10 MW classes used a *de minimus* portion of single-

---

[2]REACT appealed the Commission's refusal to invalidate the ECOSS. In what appears to be a minute order, the First District denied the appeal as moot. Coalition to Request Equitable Costs Together v. Illinois Commerce Comm'n, Nos. 1-11-1781, 1-11-2200, 1-11-2260, 1-11-2274 cons. (May 16, 2013).

phase lines. If the ELL and HV over 10 MW classes did not pay for any of the costs of single-phase lines, their share of costs would be reduced by 36%, or $9 million.

¶ 19      On this issue, REACT submitted written direct and rebuttal testimony from two expert witnesses, Harry Terhune and Bradley Fultz. Terhune is a licensed engineer with special expertise in electrical engineering. He worked for ComEd for 31 years and rose to various management positions, including transmission and distribution planning manager. Terhune began his analysis with an explanation of ComEd's electric delivery system. When asked to provide an analogy of the various distribution components, Terhune answered:

> "To envision how the pieces of ComEd's distribution facilities fit together, it may be helpful to draw an analogy to a large tree. The bulk electric system and high voltage transmission system would equate to the trunk of the tree. The three-phase high-capacity primary distribution lines would be the largest branches of the tree. The single phase, two-phase, and low-capacity three-phase lines would be analogous to smaller branches radiating out. Secondary voltage lines and services would be analogous to twigs at the ends of the smaller branches."

¶ 20      More technically, primary distribution lines, also known as shared distribution lines, feeders, or circuits, leave their source substation via three-phase high-capacity main-stem electrical conductors. All primary-voltage customers benefit from the high-capacity main-stem portions of the distribution lines. As the lines progress out into the territory, the high-capacity portions of the lines may be connected or "tapped" by lower-capacity wires that serve smaller loads. The lower-capacity taps might be either single, two, or three phase. Any location with three single-phase transformers connected together may be thought of as a three-phase location or load source. The ELL and HV over 10 MW classes generally require only three-phase service, because single- or two-phase service is not strong enough. The ELL and HV over 10 MW classes might use a *de minimus* amount of single-phase service to facilitate lower-voltage needs, such as for a guard shack, parking-lot lights, or a sign. These needs may be met by single-phase transformers and conductors connected to nearby three-phase lines.

¶ 21      Terhune understood that the cost-causation principles underlying rate design required that facilities that are not used, or are used only to a *de minimis* degree, should be excluded from the cost allocation. Presumably, as REACT later argued before the Commission, Terhune based his understanding of cost-causation principles on section 16-108(c) of the Act. That section states in part:

> "Charges for delivery services shall be cost based, and shall allow the electric utility to recover the costs of providing delivery services through its charges to its delivery service customers that use the facilities and services associated with such costs." 220 ILCS 5/16-108(c) (West 2012).

¶ 22      In Terhune's view, because the ELL and HV over 10 MW classes did not use, or used only to a *de minimus* degree, the primary single- and two-phase lines serving the lower, 4 kV needs, they should not be allocated any costs, or only a very small proportion of costs, associated with those single- and two-phase facilities.

¶ 23      Terhune made a series of recommendations to effectuate the reallocation. Primarily, Terhune recommended an immediate revision. The ELL and HV over 10 MW classes would no longer be responsible for costs associated with single- and two-phase lines, which would reduce by 36%, or $9 million, their responsibility for costs associated with the primary-voltage level lines. Responsibility for this $9 million would be evenly redistributed among all 15 of the

customer classes. (REACT would later suggest, based on data provided by ComEd witnesses, that this redistribution would have a "small impact" on the customers in the other classes, who are greater in number. For example, $9 million comprised only 0.5% of ComEd's approximately $2.3 billion overall revenue requirement. The average impact on a single residential customer would be approximately $2.58 per year.)

¶ 24    REACT's next witness, Fultz, is a managing partner at an energy consulting firm. He assists large energy users with energy-supply procurement and management. Fultz agreed with Terhune's recommendation to revise the allocations, based on the fact that the ELL and HV over 10 MW classes do not use single- or two-phase primary service.

¶ 25    REACT proposed that, even if the Commission did not reallocate the $9 million at that time, it should freeze the existing allocations pending a more detailed study to be presented at the next rate case. The study would analyze further segmenting the primary service for the various classes. As advocated by Terhune:

> "[The Commission should] direct ComEd to perform a statistically valid analysis to determine the proper proportion of Shared Distribution Lines[, *i.e*., primary line costs,] to be assigned to each customer class or subclass and incorporate those results into its ECOSS. This statistically valid analysis should, at a minimum, address REACT's concerns about allocation of single-, two- and three-phase and 4 kV primary distribution line costs."

Terhune disagreed with later criticism that the study would be too difficult to perform. He stated that a sampling of facilities could be gathered from ComEd's existing records rather than from field inspections and would not require repetitive studies for each rate-design proceeding.

¶ 26    Another interested party, the Commercial Group, like IIEC, seemed to agree with REACT that customer classes using higher voltages were being charged costs associated with system components that they did not use (such as single-phase and two-phase facilities that have "little usefulness in providing service to large load rate payers"). However, the Commercial Group found fault with REACT's proposal because it focused too narrowly on the ELL and HV over 10 MW classes to the exclusion of the other classes. The Commercial Group, like IIEC, recommended that primary-service cost allocations be revised 10% to 20% for all classes that are unlikely to use the low-load components (rather than 36% for just the ELL and HV over 10 MW classes) and that the costs be reallocated to the secondary customer classes only (rather than equally among all classes). IIEC, through witness Robert Stephens, offered that the Wisconsin Power and Light Company was attempting a similar segmentation of primary-service costs.

¶ 27    On the other side, ComEd had hired a consulting group, Christensen Associates Energy Consulting, LLC, in an effort to comply with the Commission's prior directives to refine its primary/secondary delineation. Christensen looked to 16 different utilities, and none of those utilities reported further segmenting primary service into different phases of service. Michael O'Sheasy, a ComEd witness who worked for Christensen, was not aware of any utility that segmented primary service by phase; it was not standard practice in the industry.

¶ 28    O'Sheasy termed REACT's proposed method "allocation by exclusion." The danger with allocation by exclusion is that allowing one customer class to exclude costs associated with system components that it does not use could invite other customer classes to do the same, creating an increasingly disaggregated and complex rate design.

¶ 29 O'Sheasy further opined that separating costs by phase of service would require a determination of the "path of service." The problem with this approach is that paths can change over time. Load requirements prevailing at the time of the study could change over time. Cost efficiency might require that older equipment remain in place until a later date. A single-phase primary tap might be present due simply to the history of how the utility's primary-service construction practices evolved over time. A single-phase tap might be changed to a three-phase tap to accommodate increased load needs.

¶ 30 ComEd witness Bradley Bjerning and Staff witnesses Peter Lazare and William Johnson each testified that REACT's and IIEC's proposals to exclude costs associated with primary single- and two-phase lines were one-sided. Bjerning stated that such proposals consider the extent to which large-load users do not use primary single-phase lines, but it does not consider the extent to which secondary customers or single-phase users do not require three-phase primary-voltage configurations. Lazare testified:

> "I consider [these proposals] one-sided ***. [Stephens] focuses solely on the costs that he believes primary customers should avoid but ignores those additional costs that primary customers may create on the system.
>
> * * *
>
> [The proposals] should be rejected. If primary customers should not be held responsible for the costs of single-phase lines, then secondary customers should not have to bear the additional expense of three[-]phase service required to serve the end-uses of primary customers."[3]

¶ 31 Johnson also found REACT's approach to be one-sided. He explained that, ideally, a high degree of facility-to-customer matchup aids cost-based rate design or allocation. However, one must consider the system as a whole when designing rate allocation. The selective elimination of costs for a few chosen classes (ELL and HV over 10 MW) could result in inequity, because each class's full responsibility for costs associated with the distribution system have not been accounted for in a consistent manner.

¶ 32 ComEd witness, and its rates and policy director, Christine Brinkman also stressed the importance of considering the system as a whole. She generally agreed with the principle that costs should be allocated to those who cause the costs to be incurred. She conceded that, if a customer (class)[4] did not use a "particular set" of facilities, it would not be fair to allocate costs

---

[3]This appeal concerns further segmentation within the *primary* system. Lazare's reference to the *secondary* system is likely due to a difference between IIEC's and REACT's respective proposals. As noted, IIEC proposed that 10% to 20% of the costs associated with single-phase lines be reallocated to *secondary* customers (in effect, challenging the accepted dividing line between primary and secondary users), and REACT proposed that 36% (basically all) of the costs associated with single-phase lines be reallocated *among all classes equally* (both primary and secondary customers). While both proposals were in play when Lazare testified, here we are concerned only with REACT's proposal. Lazare's warning against disrupting the balance in an allocation system applies to both proposals.

[4]As REACT complains, ComEd witnesses did not always specify whether they were referring to an individual customer or an entire customer class. This matters because, if the witnesses were referring to individual customers, they misunderstood REACT's position to be more complex than it is. Here, however, we can infer that Brinkman referred to an entire *class*, because she closed her sentence by referring to the "group."

for those facilities to that customer "group." However, she did not believe that ComEd could "direct charge" specific facility costs to specific customers. Rather, differentiating the facilities used provides a basis for a customer's classification in a certain group. Costs are apportioned based on the system as a whole. Interclass cost allocations are (largely) based on peak demand, because different classes impose different costs on the system, based on their respective peak demands.

¶ 33        As to REACT's request for further study, Bjerning advised against it. Terhune's method of cost allocation was not the only method. Bjerning acknowledged that further refinement is always possible. He even acknowledged that, technically, ComEd had the capability of performing the study. However, practicality is always a concern. In his view, the proposed study would be complex and resource-intensive. Even if ComEd sampled only a small, yet statistically reliable, portion of its 4.8 million meters and 6,400 circuits, spread out over 11,400 square miles, further inquiry would be required to determine: (1) if the meter points are served from the single-phase, two-phase, or three-phase primary-voltage configuration; (2) if the circuit extends in that configuration before or beyond the meter points; (3) if the meter points are connected at the 34 kV, 12 kV, or 4 kV portion of the circuit; (4) if the circuit extends in that voltage or combination of voltages before or beyond the meter points; (5) if the meter points are served from an overhead or underground configuration of the circuit; (6) if the circuit extends in the overhead or underground configuration before or beyond the meter points; (7) the age of the circuit serving the meter points; (8) the age of the circuit before or beyond the meter points; (9) the other circuits that provide backup service to the circuit serving the meter points; and (10) if the meter points are connected to a switch that requires capacity from a different circuit when the preferred circuit is out of service.

¶ 34        At the close of evidence and upon review, the Commission approved ComEd's proposed rate design, with an exception concerning the railroad class to be discussed later. The Commission confirmed its commitment to cost-based allocations, but it did not find practicable the level of precision in REACT's proposed itemization of costs. It rejected REACT's argument that section 16-108(c) of the Act required that level of precision. 220 ILCS 5/16-108(c) (West 2012). As such, the Commission rejected REACT's proposal to further segment the primary-service level into phases for cost-allocation purposes. The Commission stated:

> "While *it is apparent in the evidence presented in this case that certain groups of facilities are not used by larger load customers*, segmenting the cost allocation by phase of service does not appear to be practicable. There is also some question as to whether any attempt to segment according to phase of service would be equitable or accurate. [Thus,] *[t]he Commission rejects the changes to cost allocations to primary service as proposed by REACT ***.*" (Emphases added.) Commonwealth Edison Co., No. 13-0387, at 51 (Dec. 18, 2013).

¶ 35        The Commission found that REACT's proposal leaned toward what ComEd's and the Staff's witnesses called "allocation by exclusion." Allowing one class to exclude costs associated with certain system components could not be done fairly without allowing others to do the same. The Commission rejected REACT's argument that it was being overbilled by $9 million. It stated that REACT did not adequately explain who would be responsible for absorbing the $9 million. Therefore, it agreed with Bjerning and Lazare that REACT's approach was one-sided.

¶ 36    The Commission declined to order the further study that REACT proposed. It noted that there was no dispute that ComEd had the capability to perform such a study. However, it agreed with ComEd that the study would be "highly complex," referencing several of the 10 tasks set forth by Bjerning. Moreover, the Commission questioned the lasting impact of any such study, noting that it could quickly "become an unsustainable process because the distribution system is constantly changing." The Commission agreed that allowing each class to exclude costs associated with system components could make the rate-design process "increasingly disaggregated and complex."

¶ 37    The Commission did make one exception to the general practice against further segmenting the primary-service level. As to the railroad class only, the Commission allowed for the exclusion of costs associated with 4 kV facilities, *i.e.*, the lower end of the primary-service level. The Commission agreed with witness testimony that the railroad class was a "unique class." In addition to providing a public service, it operated in an "extremely" limited geographic region and was comprised of only two customers, each of which took voltage at a uniform 12.5 kV. Therefore, further segmenting primary-service level costs for the railroad class did not present as many technical difficulties. REACT petitioned for rehearing. The Commission denied the petition. This appeal followed.


¶ 38                                    II. ANALYSIS

¶ 39    REACT challenges the Commission's finding that the current ECOSS provided a sufficient foundation for a fair rate design or allocation. It argues that the ECOSS was flawed in that it should have called for further segmenting costs associated with the primary-voltage level of service by phase of service. It contends that its members are being overbilled by $9 million for costs associated with single-phase lines that they do not use. In the event that the overallocation is not immediately corrected, REACT urges that, at a minimum, the current allocations should be "frozen" and further study should be ordered.

¶ 40    Before we can address these issues, however, we must begin with an interpretation of section 16-108(c) of the Act. 220 ILCS 5/16-108(c) (West 2012). In large part, REACT's argument that its members should not be charged for costs associated with single-phase lines is based on its interpretation of section 16-108(c). Of course, if REACT were able to establish that the Commission misinterpreted and, consequently, misapplied the statute, it could avoid the difficult task of establishing that the Commission's decision on the merits was an abuse of discretion. As will be explained in more detail below, the standard of review in interpreting a statute is ordinarily *de novo*, but, where the language offers more than one reasonable interpretation, we defer to the agency charged with enforcing the statute. *Church v. State*, 164 Ill. 2d 153, 162 (1995). Here, the Commission reasonably rejected REACT's interpretation of the statute and we defer to its decision regarding the statute.


¶ 41                                A. Section 16-108(c)

¶ 42    REACT argues that the Commission violated section 16-108(c) of the Act in approving a rate design or allocation that allowed for customers in the large-load classes to be charged for costs associated with one- and two-phase lines (or facilities) that they do not use. 220 ILCS 5/16-108(c) (West 2012). REACT notes that we must reverse the Commission if the Commission's order is in violation of the state or federal constitution or other laws. 220 ILCS

5/10-201(e)(iv)(C) (West 2012). Thus, at issue is an interpretation of section 16-108(c) of the Act.

¶ 43       Generally, courts review *de novo* the interpretation of a statute. *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 132011, ¶ 19. The goal of statutory interpretation is to ascertain and give effect to the legislature's intent. *Id*. The best indicator of the legislature's intent is the language of the statute, which should be given its plain and ordinary meaning. *Id*. It is not permissible to depart from the plain language of the statute by reading into it exceptions, limitations, or conditions not expressed by the legislature. *Id*. ¶ 35. Each word should be given reasonable meaning and not rendered superfluous. *People ex rel. Department of Labor v. Sackville Construction, Inc.*, 402 Ill. App. 3d 195, 198 (2010). The statute is to be read as a whole with all relevant parts to be considered. *Gardner v. Mullins*, 234 Ill. 2d 503, 511 (2009). Where there appears to be a conflict, the specific provision controls over the general provision. *People v. Arnhold*, 359 Ill. App. 3d 857, 861 (2005).

¶ 44       When the language is clear and unambiguous, the statute must be interpreted *de novo* without resort to other aids of construction and without deference to the agency's decision. *Boaden v. Department of Law Enforcement*, 171 Ill. 2d 230, 239 (1996) (declining to defer to the agency's interpretation where the statute was not ambiguous). However, if the statute is ambiguous, the court does not perform its own *de novo* interpretation of the statute, as would be necessary in the absence of an administrative interpretation. *Illinois Bell Telephone Co. v. Illinois Commerce Comm'n*, 362 Ill. App. 3d 652, 657 (2005). Rather, the court merely asks whether the agency charged with the statute's administration came to a reasonable interpretation based on a permissible construction of the statute. *Church*, 164 Ill. 2d at 162. While the court is not "bound" by the agency's interpretation, the court is not justified in reversing the decision merely because it would have interpreted the statute differently. *Id*.

¶ 45       The first task, therefore, is to determine whether the statute at issue is ambiguous. A statute is not ambiguous simply because the parties disagree as to its meaning. *Kaider v. Hamos*, 2012 IL App (1st) 111109, ¶ 11. A statute is ambiguous if its meaning cannot be interpreted from its plain language *or* if it is capable of being understood "by reasonably well-informed persons" in more than one manner. *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 396 (2003). Here, for the reasons that follow, the interpretation offered by REACT is not the only reasonable interpretation. Therefore, the Commission's interpretation of the statute is entitled to deference so long as it is reasonable.

¶ 46       Again, the contested portion of section 16-108(c) provides:

> "Charges for delivery services shall be cost based, and shall allow the electric utility to recover the costs of providing delivery services through its charges to its delivery service customers that use the facilities and services associated with such costs." 220 ILCS 5/16-108(c) (West 2012).

¶ 47       REACT reads this sentence as a mandate that the Commission "approve 'cost based' rates *that* assign costs to 'customers that use the facilities and services associated with such costs.' " (Emphasis added.) In other words, REACT reads the sentence to *define* "cost-based rates" as rates that assign costs to customers that use the facilities and services associated with such costs. Therefore, in its view, the provision mandates that a class of customers that never uses a particular facility should not bear any costs that can be traced back to that facility.

¶ 48       At least two weaknesses in REACT's interpretation prevent it from being the only reasonable one. First, REACT ignores the structure of the sentence when it proffers that the

second clause defines the first. Rather, the sentence structure more likely indicates two *separate* mandates: (1) that charges *shall* be cost based; and (2) that charges *shall* allow for the aforementioned cost-recovery method. If the second clause defined the first, there would be no need for the comma, the conjunctive "and," or the second "shall."

¶ 49　　Second, REACT ignores the word "allow." The word "allow" connotes a permissive, rather than a mandatory, approach. Together, the words "shall *allow* the electric utility" may be read as the legislature's permissive grant of authority to the utility to design rates and allocate costs in a way that might otherwise be challenged by a customer. Read this way, the first clause in the sentence sets a boundary in designing rates and allocating costs and the second clause offers an option, perhaps even a preferred option, in designing rates and allocating costs within that boundary.

¶ 50　　We do not, by the previous two paragraphs, attempt to interpret the statute. Again, where the words are suggestive of more than one meaning, the main question is simply whether the Commission's interpretation was reasonable and should be afforded deference. Therefore, we mean only to show that REACT's interpretation of the statute has weaknesses and cannot be considered the only reasonable interpretation. Certainly, the Commission itself values the broader principle set forth by REACT that customer classes' use of facilities and services should be a predominant factor in allocating costs. It simply disagrees that the statute requires what it considers to be an overly "granular" *itemization* of costs in order to design a reliable, reasonable, and fair *allocation* of costs.

¶ 51　　The Commission agrees with REACT that section 16-108(c) mandates cost-based rates. However, it argues that other provisions in the Act, as well as existing case law, more broadly define cost-based rates so as not to require the level of precision that REACT envisions in matching up facilities to customer classes. Under the Commission's interpretation, section 16-108(c) does not *mandate* that costs associated with a precise facility be recovered only from customers that use that facility. Rather, section 16-108(c) *allows* that costs be recovered from customers that use the facilities and services associated with the costs.

¶ 52　　The Commission points to other provisions in the Act to support its view that the overall goal of rate design is fairness in allocating costs among the customer classes, not "granular" precision in itemizing costs. For example, section 8-101 states in part:

　　　　"All rules and regulations made by a public utility affecting or pertaining to its charges or service to the public *shall be just and reasonable*." (Emphasis added.) 220 ILCS 5/8-101 (West 2012).

¶ 53　　Section 9-241 states in part:

　　　　"No public utility shall establish or maintain *any unreasonable difference* as to rates or other charges, services, facilities, or in any other respect, either as between localities or as between classes of service." (Emphasis added.) 220 ILCS 5/9-241 (West 2012).

¶ 54　　The Commission agrees that cost of service is a predominant and mandatory component in crafting a fair rate design. For example, section 1-102 states in part:

　　　　"The General Assembly finds that the health, welfare and prosperity of all Illinois citizens require the provision of adequate, efficient, reliable, environmentally safe and least-cost public utility services at prices which *accurately reflect the long-term cost of such services and which are equitable to all citizens*. It is therefore declared *** that

public utilities shall continue to be regulated effectively and comprehensively. \*\*\* [T]o ensure[:]

\* \* \*

(d) *Equity*: the fair treatment of consumers and investors in order that
\*\*\*

(ii) the application of rates is based on public understandability and acceptance of the reasonableness of the rate structure and level;

(iii) the cost of supplying public utility services is allocated to those who cause the costs to be incurred;

\* \* \*

(viii) the rates for utility services are affordable and therefore preserve the availability of such services to all citizens." (Emphases added.) 220 ILCS 5/1-102(d)(ii), (iii), (viii) (West 2012).

However, the Commission posits that, while cost of service is a predominant and mandatory component of rate design, the Act allows for the possibility that, under certain limited circumstances, it need not be the *only* component. In other words, the limited consideration or incorporation of a noncost-based factor into a rate design would not necessarily disqualify the overall design from satisfying the requirement that it be cost-based. For example, section 1-102(d)(iv) states that "if factors other than cost of service are considered in regulatory decisions, the rationale for these actions [shall be] set forth." 220 ILCS 5/1-102(d)(iv) (West 2012).

¶ 55    In sum, the Commission rejected REACT's interpretation of section 16-108(c), and this rejection is reasonable and consistent with the broad language of the Act as a whole. See also *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 322 Ill. App. 3d 846, 854 (2001) (generally holding that the term "cost based" was susceptible to more than one interpretation and, therefore, affording deference to the agency's reasonable interpretation of the term). Moving forward with deference to the Commission's broader reading of the Act, we address REACT's remaining arguments that: (1) the current ECOSS results in an inaccurate, or unfair, allocation of costs; and (2) the study proposed by REACT is necessary to obtain greater precision in the itemization of costs. Then, as a final matter, we address REACT's concern that the Commission treated the railroad class differently by allowing it to further segment primary costs.

¶ 56    In evaluating each of these arguments, we are mindful that the Commission's decision must be supported by "substantial evidence." 220 ILCS 5/10-201(e)(iv)(A) (West 2012); *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2014 IL App (1st) 132011, ¶ 54. "Substantial evidence" is more than a mere scintilla of evidence, but it does not have to rise to the level of a preponderance of the evidence. *Commonwealth*, 2014 IL App (1st) 132011, ¶ 54. It is the Commission's role to weigh the evidence. *Id*. In fulfilling this role, the Commission must resolve conflicting expert opinions on highly technical matters. *City of Chicago v. Illinois Commerce Comm'n*, 133 Ill. App. 3d 435, 445 (1985). Rate-design and cost-allocation issues, because of their complexity, are " 'uniquely a matter for the Commission's discretion.' " *Ameren Illinois Co. v. Illinois Commerce Comm'n*, 2012 IL App (4th) 100962, ¶ 147 (quoting *Central Illinois Public Service Co. v. Illinois Commerce Comm'n*, 243 Ill. App. 3d 421, 446 (1993)).

REACT argues that the Commission erred in approving the cost allocations set forth in the ECOSS. In its view, the cost allocations are inaccurate and unfair, because they are based on an ECOSS that "attributes to [the ELL and HV over 10 MW classes] *millions of dollars* of costs associated with identifiable and specific ComEd distribution facilities[, *i.e.*, primary single- and two-phase lines,] *which those customers do not use.*" (Emphases in original.) REACT argues that the costs attributed to the ELL and HV over 10 MW classes are "artificially inflated by \$9 million per year." REACT proposes that the allegedly excessive \$9 million be evenly redistributed among all customer classes.

In large part, REACT bases its argument on a point that we have already rejected: its interpretation that section 16-108(c) requires an exacting facility-to-customer-class matchup. However, REACT also attempts to challenge the Commission's order by: (1) pointing to what it believes to be an internally inconsistent statement; and (2) alleging that the Commission departed from its 2007, 2008, and 2010 orders.

As to the first challenge, REACT argues that the following statement by the Commission demonstrates that its approach to the case was not well reasoned:

> "While *it is apparent in the evidence presented in this case that certain groups of facilities are not used by larger load customers*, segmenting the cost allocation by phase of service does not appear to be practicable. There is also some question as to whether any attempt to segment according to phase of service would be equitable or accurate. [Thus,] *[t]he Commission rejects the changes to cost allocations to primary service as proposed by REACT \*\*\*.*" (Emphases in original and internal quotation marks omitted.)

REACT posits that, in this statement, the Commission admits an inaccurate cost allocation but does nothing to fix it. REACT's position is premised on its interpretation of section 16-108(c) that cost-based allocations require near perfect precision in facility-to-customer-class matchup. However, as we defer to the Commission's reasonable rejection of this interpretation, we see no inconsistency in the challenged statement. Rather, in this statement, the Commission states that, although the current allocation method does not provide for an *exacting* facility-to-customer-class matchup, the Commission does *not* believe that any attempt at further segmentation would result in a more "equitable or accurate" allocation than the current allocation method provides, which, so far as this court can infer from the evidence accepted by the Commission, looks at each class's proportionate strain on the system as a whole.

As to the second challenge, REACT contends that, in approving the current ECOSS, the Commission departed from its own 2007, 2008, and 2010 directives. In REACT's view, a departure from prior directives would compromise the reliability of the Commission's ruling such that it would be entitled to less deference. See, *e.g.*, *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n*, 136 Ill. 2d 192, 228 (1989) (heightened degree of appellate scrutiny is appropriate where ruling "drastically departs" from past Commission practice); *cf. Peoples Gas, Light & Coke Co. v. Illinois Commerce Comm'n*, 175 Ill. App. 3d 39, 51 (1988) (the legislature has given the Commission broad powers to deal freely with each situation as it comes, regardless of how the Commission previously handled a similar, or even the same, issue).

¶ 62 We reject REACT's argument. The Commission's 2013 order does not depart, let alone "drastically depart," from its 2007, 2008, and 2010 orders. All of the prior orders directed ComEd to further refine its ratemaking practices in allocating costs between primary and secondary systems. Although the Commission ordered further investigation to support that differentiation, it never required ComEd to further segment the primary-service level. To the contrary, in the 2010 order, it expressly rejected IIEC's plea to do so: "Nothing in the [2008 order] required ComEd to do what the IIEC argues." Commonwealth Edison Co., No. 10-0467, at 176 (May 24, 2011). The Commission's 2010 criticisms of ComEd's prior ECOSS, which it called "less than perfect" and in need of "further refinement," concerned ComEd's failure to adequately observe and sample its facilities and consider other utilities' ratemaking practices. Heading into the 2013 proceedings, ComEd hired the Christensen consulting group in part to remedy its prior shortcomings. Thus, the Commission's 2013 order is not a departure from the 2007, 2008, and 2010 orders. Rather, it reflects the Commission's decision that, for the time being and as to the issue at hand, its prior directives for further refinement and investigation have been satisfied.

¶ 63 As we are not persuaded by REACT's three arguments, its challenge to the Commission's finding that the allocations are fair must fail.

¶ 64 In any case, the evidence supports the Commission's finding that REACT's proposed solution is problematic. Johnson and Bjerning testified that evenly redistributing the $9 million that the ELL and HV over 10 MW classes are currently paying for costs associated with primary single-phase lines would result in a systemic imbalance. The ELL and HV over 10 MW classes are not the only classes that shoulder the burden in paying for costs associated with the primary single-phase lines. For example, IIEC argued that costs associated with the single-phase lines should be reduced for all classes mid-load and up. Those classes would continue paying for their share of the costs of the single-phase lines, plus a portion of the $9 million previously paid by the ELL and HV over 10 MW classes. In seeking to completely eliminate its share of the costs associated with the primary single-phase lines, REACT seeks to alter the effect on only the ELL and HV over 10 MW classes of what it perceives to be a systemic problem. On a systemic level, however, the costs associated with the primary single-phase lines would not be allocated to their users with any more precision than they were before.

¶ 65 Thus, REACT's proposed reallocation highlights what the Commission reasonably deemed a one-sided approach. The ELL and HV over 10 MW classes would be relieved of their formerly assigned $9 million share of the costs associated with single-phase lines (albeit, having a portion of that share returned to them as part of the even redistribution among the 15 classes), while members in other classes would keep their formerly assigned share AND shoulder an additional share of the redistributed $9 million. Moreover, no reallocations would be made to the single-phase users' share of costs associated with three-phase lines. Granted, single-phase users' electricity first travels through a three-phase line before being "tapped" out. It does not follow, however, that single-phase users *need* such an extensive network of three-phase lines. If the system were built to serve exclusively the single-phase users, rather than to accommodate the needs of all of the classes, then, to borrow Terhune's analogy, the tree's trunk and largest branches would likely be thinner.

¶ 66 We appreciate that REACT does not oppose, and, in fact, urges, further study to parse out components of the system that might be unnecessary to single-phase users. As addressed in the

next portion of our analysis, however, we affirm the Commission's finding that further study with the goal to change the method of allocation is not worth the costs associated with such a study.

¶ 67                                   C. Further Study

¶ 68    REACT next argues that the Commission erred in failing to order a proposed study that would enable further segmentation of the primary service by phase of service. REACT posits that the benefits of the study would outweigh its costs, and the Commission erred in finding otherwise.

¶ 69    As to benefits, REACT raises many points that we have already rejected. REACT argues that the study would satisfy section 16-108(c) of the Act. We have already rejected REACT's interpretation of section 16-108(c), and, therefore, we disagree that section 16-108(c) requires the sort of precision that the study would aim to provide.

¶ 70    REACT also argues that the study is necessary to prevent its members from being overbilled. Throughout its brief, REACT cites certain statistics to give the impression that its members are being overbilled. For instance, REACT notes that, since 2007, the ELL and HV over 10 MW classes have been experiencing rate increases that will ultimately approach 140% and 129%, respectively, which, in comparison, are higher percentage increases than those proposed for the other classes. However, as ComEd noted in its initial proposal, a goal behind the increases for the ELL and HV over 10 MW classes was to eliminate existing subsidies afforded to those classes. In context, therefore, REACT has not established a true imbalance.

¶ 71    Additionally, REACT notes that, currently, approximately 36%, or $9 million, of the costs allocated to the ELL and HV over 10 MW classes are associated with single-phase primary lines that, as a general rule, those classes do not use. However, it does not follow that members of the ELL and HV over 10 MW classes are currently overbilled by 36%. The ECOSS bases rates on the use of the system as a whole. As Lazare noted, one class cannot selectively exclude components of the system without allowing other classes to do the same.

¶ 72    REACT has implicitly argued throughout its brief that a lack of *precision in itemizing* costs has led to a lack of *fairness in allocating* costs. However, as highlighted by the flaws in REACT's proposed reallocation, precision in itemizing must not be conflated with fairness in allocating. While the former is a potential indicator of the latter, it is not the goal in and of itself.

¶ 73    Accordingly, the Commission reasonably found that the benefits of the proposed study were not as great as REACT contends. The study is not necessary to bring the ECOSS into compliance with section 16-108(c). The study is not necessary to correct a dramatically disproportionate rate increase or a $9 million overbilling to the ELL and HV over 10 MW classes. Also, there is no guarantee that a study aimed to increase the precision of itemizing costs will lead to increased fairness in allocating costs.

¶ 74    As to the burdens associated with the study, O'Sheasy testified that it was not the industry norm to further segment primary costs by phase. He noted that none of the 16 utilities surveyed by ComEd's consultant further segments primary costs by phase. Johnson, O'Sheasy, Bjerning, and Lazare testified in various ways that segmenting primary costs by phase amounted to an unbalanced "allocation by exclusion" and/or an unreliable "path of service" approach.

¶ 75    These witnesses explained that allocation by exclusion was disfavored. The electrical distribution system is a large, interconnected system meant to serve multiple customer classes. If one customer class paid costs for only the specific system components it used without allowing all customer classes to do the same, the existing allocations would become unbalanced. Yet, if all customer classes did the same, the rate design could become "increasingly disaggregated and complex."

¶ 76    O'Sheasy further criticized REACT's proposed study as a "path of service" approach. He explained that the distribution system is constantly changing. Load requirements prevailing during the study could change over time. A single-phase primary tap might be present due simply to the history of how the utility's primary-service level construction practices evolved over time. A single-phase tap might be changed to a three-phase tap to accommodate increased load needs.

¶ 77    Additionally, Bjerning testified that the proposed study would be complex and resource-intensive. ComEd has 4.8 million meters, connected to 6,400 circuits, across over 11,400 square miles. Even if ComEd sampled only a small, yet statistically reliable, portion of those meters, further inquiry would be required to determine a multitude of factors concerning circuit configurations before and beyond the meter points.

¶ 78    REACT responds with evidence to the contrary. For instance, Stephens testified that Wisconsin Power and Light was proposing a similar "separation" within the primary-voltage level. Bjerning acknowledged that ComEd had the capability to perform the study. And Terhune disagreed that the study would be as complicated as Bjerning envisioned. Terhune explained that the sampling could be gathered from ComEd's existing records rather than from field inspections and would not require repetitive studies for each rate-design proceeding.

¶ 79    However, the Commission was not required to accept REACT's assessment. Although REACT pointed to a single utility company nationwide that segmented costs by phase, ComEd pointed to 16 that did not. Similarly, the Commission was free to favor Staff and ComEd witnesses' testimony, stating that the study would be complex, over Terhune's testimony. Questions concerning rate design and cost allocation are uniquely a matter for the Commission's discretion. See, *e.g*., *Ameren*, 2012 IL App (4th) 100962, ¶ 147. Here, as the evidence supported the Commission's findings, REACT has not convinced us to reverse its decision.

¶ 80                                    D. Railroad Class

¶ 81    Finally, we reject REACT's suggestion that, because the Commission allowed further segmenting primary-service costs for the railroad class, the Commission must allow further segmenting primary-service costs for the ELL and HV over 10 MW classes. Again, for the railroad class only, the Commission excluded costs associated with 4-kV-and-lower facilities, 4 kV being the lowest end of the primary-voltage service level. The Commission reasoned that the railroad class does not use those low-voltage facilities and that, as it can easily be done, those costs should be excluded.

¶ 82    REACT points to section 9-241 of the Act, which states that "[n]o public utility shall establish or maintain any *unreasonable* difference as to rates or other charges, services, facilities, or in any other respect, either as between localities or as between classes of service." (Emphasis added.) 220 ILCS 5/9-241 (West 2012); see also *Apple Canyon Lake Property*

*Owners' Ass'n v. Illinois Commerce Comm'n*, 2013 IL App (3d) 100832, ¶ 44 (the Commission may not take arbitrary or capricious action). REACT posits that, if the Commission can segment primary-service costs for the railroad class, it can do the same for the ELL and HV over 10 MW classes.

¶ 83 REACT fails to fully acknowledge that section 9-241 does *not* preclude rate differences between classes. Rather, section 9-241 precludes only *unreasonable* differences. Here, the Commission took care to explain its reasons for treating the railroad class differently. As to the policy behind excluding 4 kV costs, it noted that the railroad was a "unique class," and it recognized "the economic, environmental and social benefits flowing from a reasonably priced public transportation system in a populous metropolitan area." Moreover, as to the feasibility of excluding 4 kV costs, it accepted that the railroad class was, per one witness, "exceptionally geographically restricted" and was comprised of only two customers, each of which took voltage at a uniform 12.5 kV. In contrast, members of the ELL and HV over 10 MW classes are spread over a wide geographic area, are comprised of many customers, and do not accept a uniform voltage. REACT makes no real attempt to discredit these bases for treating the railroad class differently. Accordingly, we accept the Commission's reasoning as to the railroad class.

¶ 84                                    III. CONCLUSION
¶ 85 For the aforementioned reasons, we affirm the Commission's order.

¶ 86 Affirmed.